STATE OF CONNECTICUT *v.* CHARLES MCDOUGAL
(SC 15500)

STATE OF CONNECTICUT *v.* JOHN RUFFIN
(SC 15501)

Berdon, Norcott, Katz, Palmer and McDonald, Js.

Argued November 8, 1996—officially released July 8, 1997

*Robert G. Golger*, special public defender, for the appellant (defendant in the first case).

*Philip Russell*, with whom were *Roy S. Ward* and, on the brief, *David Shein*, for the appellant (defendant in the second case).

*John A. East III*, assistant state's attorney, with whom, on the brief, were *Eugene Callahan*, state's attorney, *Bruce Hudock*, senior assistant state's attorney, and *James Bernardi*, assistant state's attorney, for the appellee in both cases (state).

*Opinion*

MCDONALD, J. After a joint trial before a jury, the defendants, John Ruffin and Charles McDougal, were

convicted of conspiracy to commit murder in violation of General Statutes §§ 53a-54a (a) and 53a-48 (a).[1] Ruffin was also convicted of criminal attempt to commit murder in violation of General Statutes §§ 53a-54a (a) and 53a-49 (a).[2] The defendants appealed from the judgment[3] of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

On appeal, both defendants claim that: (1) the trial court improperly admitted into evidence for substantive purposes the prior inconsistent statements of two witnesses; and (2) the state's peremptory challenges of

[1] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ."

General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

The jury acquitted both McDougal and Ruffin of manslaughter in the first degree. See General Statutes §§ 53a-55 (a) (3) and 53a-8. The jury also acquitted McDougal of criminal attempt to commit murder. See General Statutes §§ 53a-54a, 53a-8 and 53a-49.

[2] General Statutes § 53a-49 (a) provides: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

Ruffin was charged in an amended information with one count each of conspiracy to commit murder and manslaughter in the first degree and two counts of criminal attempt to commit murder. The trial court granted Ruffin's oral motion for a judgment of acquittal as to one count of criminal attempt to commit murder. Thereafter, the state filed the substitute information that resulted in the verdict and judgment involved in Ruffin's appeal.

[3] Ruffin has appealed from the judgment of the trial court sentencing him to forty years imprisonment, and McDougal has appealed from the judgment of the trial court sentencing him to twenty years imprisonment, suspended after fourteen years, and five years probation.

several venirepersons because of their youth deprived the defendants of their right to a fair trial. Ruffin additionally claims that the trial court: (1) failed to require the state to describe the manner in which he was alleged to have committed manslaughter in the first degree; and (2) deprived him of his right to a fair trial by evincing a bias in favor of the state. We affirm the judgment of the trial court in each case.

The jury reasonably could have found the following facts. In July, 1993, Ruffin was locked in a territorial dispute over drug selling at the Southfield Village housing project in Stamford with a group known as the "Jamaicans." On July 3, 1993, Ruffin's girlfriend, Toneria Dix, had a fight with Teresa McCullen at Southfield Village. During the fight, two "Jamaican" males held Dix while McCullen sprayed her with mace.

When Dix and her friend, Nancy Thompson, reported this to Ruffin at Ludlow Street that afternoon, he immediately organized and led an armed assault on the "Jamaicans" at Southfield Village. Ruffin was armed with an AR-15 assault rifle and his five companions, including McDougal, were armed with handguns. Dix and Thompson traveled with Ruffin and McDougal to Southfield Village in one automobile, and the others traveled in another automobile. When Ruffin's followers spotted the "Jamaicans" and McCullen in the Southfield Village courtyard, they opened fire.

At the time, there were approximately seventy people in the courtyard, including seven year old Jasmine Merced, who was attending a birthday party with about fifteen other children. In the midst of eating cake and ice cream, Jasmine Merced was shot and killed in the presence of her mother.

I

Each of the defendants claims that the trial court improperly admitted for substantive purposes the writ-

ten statements that Thompson and Ebony Phillips provided to the Stamford police. The defendants argue that the court should have allowed them to inquire further into the circumstances surrounding the reliability and voluntariness of the statements prior to admission, and that the statements were not sufficiently reliable to justify admission. The defendants finally argue that the trial court improperly bolstered the credibility of the statements by its comments and instructions to the jury.

At trial, the state called Thompson, who testified on direct examination that she went to Ludlow Street with Dix and Patricia Williams in a grey car. Thompson testified that after Dix talked to Ruffin, she, Dix, Williams, Ruffin, McDougal and Torik Baldwin returned to Southfield Village. Although she further testified that the other assailants, as well as a red sports car, were also at Ludlow Street, she said that she did not see anybody leave in the red car. Initially, Thompson also testified that she did not hear Ruffin say anything at Ludlow Street or while traveling to Southfield Village. At one point, however, she testified: "Only thing I know [Ruffin] said was—if you coming, come. If you not—is you coming." She further testified that she saw a soft, black pouch in the grey car, that it looked like it had a gun in it, but that she did not see what was underneath the pouch.

The state then sought to introduce a prior, contradictory written statement signed by Thompson on May 6, 1994. Thompson testified before the jury that she provided the information contained in the statement. She also testified that when she gave the statement to police, she was attempting to be truthful and accurate. Outside the presence of the jury, she testified that a police officer typed the statement as she spoke. She then read and corrected the statement, initialed a rights waiver section, and signed each of the three pages of the

statement. In that signed statement, Thompson attested that her statement was truthful and voluntary, and that she was aware of the penalty for perjury. Then defense counsel questioned Thompson concerning the statement. She responded that the statement had not been given voluntarily or under oath, and that she had not gone to the police station of her own free will. When defense counsel sought to question Thompson further about how she traveled to the police station, where the statement was given, and whether she was told what would happen to her if she did not sign the statement, the trial court sustained the state's objection to the relevancy of the questions.

The defendants argued that if they had been permitted to continue questioning Thompson, she would have stated that the police "came to her home, put her into a police car, brought her to a police station, put her into a room in a detective bureau . . . threatened and intimidated her . . . [a]nd had already prepared at least some portions of this statement before her arrival there." The trial court then found that a part of the statement was admissible pursuant to *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).[4]

"In *State* v. *Whelan*, supra, [200 Conn.] 752, we emphasized that a prior inconsistent statement had to be given under circumstances ensuring its reliability and trustworthiness in order to be admissible. We there-

---

[4] Only the following portion of the statement was submitted to the jury: "*Before we left the south end* [Ruffin] *said to* [Baldwin], 'If you are going to do something, come on. If you are not going to do nothing, don't come.' I saw a large gun in a carrying bag, and underneath the bag were some smaller guns. These guns were on the floor, near the back seat.

"There was also a second car there, the one which Smash [Wooten] and Dwayne [Goethe] came up on. This car I believe is Dwayne's, because I seen him in it before. When we left the south end, Dwayne, Smash and Marcellus [Ruffin] went in the red car. We pulled off first, and they pulled off second."

fore declined to allow prior oral statements of a witness to be used as substantive evidence, 'limit[ing] substantive admissibility of prior inconsistent statements to situations where the likelihood of fabrication is slight and the risk of coercion, influence or deception is greatly reduced.' Id., 753. While we noted that the requirement that prior statements be written and signed 'is not an absolute guaranty of reliability, it does provide significant assurance of an accurate rendition of the statement and that the declarant realized it would be relied upon.' Id., 754." *State* v. *Grant*, 221 Conn. 93, 100, 602 A.2d 581 (1992).

The history of our admitting prior inconsistent statements for the truth of their contents began in *State* v. *Whelan*, supra, 200 Conn. 747, in part, because of the "realities of the criminal process." (Internal quotation marks omitted.) These realities include the fact that "the parties are rarely able to select their witnesses: they must take them where they find them." *Chambers* v. *Mississippi*, 410 U.S. 284, 296, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973). Thus, " '[d]enial of the right [to impeach the witness] leaves the party at the mercy of the witness and the adversary.' " *State* v. *Graham*, 200 Conn. 9, 17, 509 A.2d 493 (1986).

These realities are illustrated in *State* v. *Grant*, supra, 221 Conn. 101–102, where witnesses to a killing arising from a drug feud between rival drug dealers recanted their tape-recorded statements, and *State* v. *Hopkins*, 222 Conn. 117, 121, 609 A.2d 236 (1992), where an eyewitness to a robbery murder was no longer able to identify, as she had done in a written statement, the killer of her companion. In *State* v. *Hopkins*, supra, 125, the trial court was confronted with a written statement from a drug-dependent prostitute given only after the police told her that she and her husband were suspects in the crimes, and that there were other charges pending against her, all while she was under the influence of

Percocet, a powerful drug. There, this court stated: "Although these factors are relevant and proper matters for cross-examination they go to the weight of the evidence and not its admissibility." Id. This is precisely the manner in which the trial court in this case treated the claim of police pressure and the witness' written statement. In *Hopkins*, we did not depart from our determination in *Whelan* that a written and signed statement provides significant indicia of reliability to justify admission. We hold that the trial court's ruling was correct and within its sound discretion. The trial court was not required to allow defense counsel to question Thompson further concerning the circumstances of her statement prior to admitting it.

The dissent, accepting Thompson's testimony, equates the rack and the screw used in extracting a false statement to police persuasion used in obtaining statements from eyewitnesses to violent and fearful crimes. Unfortunately, in an atmosphere of violence, such witnesses may wish to say nothing or, if they do, later say they saw nothing. The *Whelan* principle's growing acceptance in our law; see 3A J. Wigmore, Evidence (Sup. 1996) § 1018; is but a reflection of that sad reality. Under *Whelan*, we leave considerable latitude to the trial judge, who sees and hears the witnesses and gauges the reliability of the statement in the circumstances of the trial. *State* v. *Newsome*, 238 Conn. 588, 596, 682 A.2d 972 (1996).

Before admitting a *Whelan* statement for substantive purposes, the trial court must determine that the statement was " 'made under conditions deemed to render [it] equal in reliability and trustworthiness to those made under the sanction of an oath and the test of cross-examination.' " Id., 602, quoting *State* v. *Whelan*, supra, 200 Conn. 752. Thompson had testified that the police typed her statement as she gave it, and that she read and corrected each page of the statement before

signing that page. Although the defendants elicited testimony from Thompson concerning police pressure to give a statement, she did not repudiate the truthfulness of the statement she made to the police, but, rather, admitted making the statement introduced into evidence. The credibility of Thompson regarding the circumstances of the statement was for the trial court to assess. We cannot substitute our evaluation based on a printed record. The court found that Thompson's out-of-court statement had sufficient indicia of reliability to be admitted for substantive purposes. In doing so, the court explicitly acknowledged the requirement that the statement be given under circumstances where the " 'likelihood of fabrication is slight and the risk of coercion, influence or deception is greatly reduced' . . . [and that] the trial court must reasonably find sufficient indicia of reliability in the circumstances surrounding the statement to admit it substantively." (Citations omitted.) *In re Bassel C.*, 33 Conn. App. 90, 94–95, 633 A.2d 733 (1993).

The court was considering a statement that was written, signed under oath and given after Thompson was advised that it was a crime to give a false statement. See *State* v. *Newsome*, supra, 238 Conn. 599–600. The statement thereby provided significant assurance that it was accurate and that the declarant realized it would be relied upon. Ultimately, it was for the trial judge, who observed Thompson testify, to determine if the statement should be admitted and for the jury to determine if it should be credited. The defendants were afforded an opportunity while cross-examining Thompson before the jury to explore all the circumstances of her statement. Thus, the jury could weigh her claim of police pressure while deciding when she was telling the truth. We conclude, under the facts and circumstances of this case, that the trial court did not abuse its discretion in admitting the prior inconsistent statement of Thompson.

The defendants also complain of the admission of the prior, written statement of Phillips, Ruffin's younger sister.[5] Again, they argue that the evidence demonstrates its unreliability. Phillips testified, however, that she and her mother read and signed the statement, which was voluntarily given. The defendants now argue that she had trouble reading part of the statement and that it should not have been admitted. The defendants made no such objection at the trial. The defendants

---

[5] The following portion of the statement was read to the jury: "Statement of Ebony Phillips, 5/24/94: My name is Ebony Phillips. I am fifteen years old. . . .

"On the Friday before the 4th of July in 1993, I was picked up in Hartford by my father, Eddie Phillips, and his girlfriend. I had my son with me. That night, I stayed in Bridgeport with my father's girlfriend.

"On the Saturday before the 4th of July, 1993, my father and girlfriend drove me and my baby to Stamford. When we got to Stamford, we went shopping.

"After shopping, we went to my grandmother's, Mildred Phillips, house. While I was there, my cousin, Latonya Phillips, came over.

"My father wanted me to meet my brother. I don't know his name, but he is heavy, fat. We, me and my baby, Latonya and her baby and my father drove to a back parking lot and the buildings were blue. The buildings were a couple of stories high.

"When we got there, I saw this girl who was messed up. Her face had scratches on it and her hair was messed up.

"My brother and his girlfriend were arguing with each other. I heard him say they were going up there. And he was going to have a fight with the girls who rolled on her. I heard my brother say they were going to have a shoot out at about four in the afternoon. I saw my brother with a gun in the back of his pants, not in his pocket, but in his waistband. My brother's gun was a black gun.

"We decided to leave. We drove back to my grandmother's house after we went shopping. I wanted to see if I could get some money. It was about an hour after we left from seeing my brother.

"At my grandmother's, I saw my brother's girlfriend talking to this girl. This girl was at my grandmother's house earlier.

"About two or three hours later, I was outside my grandmother's apartment when I heard gunshots. I saw seven to nine men with masks on. They all had guns and they were shooting towards the center of the yard. They were dressed in black.

"I grabbed my son and ran into my grandmother's apartment and laid on the floor.

"signed Ebony Phillips."

also had a full opportunity to cross-examine her before the jury. Under these circumstances, we affirm the trial court's rulings.

Under the hearsay rule, extrajudicial statements have no affirmative value because they are made out-of-court by absent persons not subject to cross-examination. Here, both witnesses were present and subject to cross-examination. There was an opportunity to question them as to the basis of their initial statements. Thus, the purpose of the hearsay rule was satisfied. We have held that a jury should not be prevented from giving statements such testimonial credit as they may seem to deserve. See *State* v. *Whelan*, supra, 200 Conn. 749–50, citing 3A J. Wigmore, Evidence (Chadbourn Rev. 1970) § 1018. As Judge Learned Hand stated: "If, from all that the jury see of the witness, they conclude that what [she] says now is not the truth, but what [she] said before, they are none the less deciding from what they see and hear of that person and in court." *Di Carlo* v. *United States*, 6 F.2d 364, 368 (2d Cir. 1925); see *State* v. *Whelan*, supra, 750.

The defendants also claim that the trial court improperly bolstered the credibility of the statements. The court instructed the jury that it was allowing the state to introduce statements by the witnesses that were given at a prior time and that were inconsistent with their testimony. The court also informed the jury that it could determine whether to give credence to the in-court testimony or the out-of-court statements. We conclude that these correct instructions did not bolster the credibility of the statements. We therefore find no error in the trial court's instructions to the jury regarding the statements.

## II

The defendants claim that the state violated their federal and state constitutional rights to a fair trial by

exercising peremptory challenges to exclude potential jurors on the basis of their youth. The defendants cite cases invoking the equal protection clause of the fourteenth amendment to the United States constitution as well as the fair cross section requirement of the sixth amendment to and the due process clause of the United States constitution. See *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986); *Duren* v. *Missouri*, 439 U.S. 357, 364, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979). The defendants also cite article first, § 8, of the Connecticut constitution.

The defendants objected to the state's peremptory challenges of four jurors. In their order of appearance, these challenged jurors were ages twenty-three (Juror 1), twenty (Juror 2), twenty-two (Juror 3), and twenty-two (Juror 4).[6] The defendants objected to the challenges of Jurors 1, 3 and 4 immediately. The defendants did not immediately object to the challenge of Juror 2, but later argued that the challenge was a part of the state's pattern of excluding young persons.[7]

In ruling on the state's challenge of Juror 1,[8] the court accepted the state's proffered explanation that it

[6] These four jurors are specifically cited by McDougal, who argues that the state's exclusion of young persons aged twenty-one through twenty-three deprived him of his right to a fair trial. Ruffin does not cite Juror 3, but rather, additionally objects to the state's peremptory challenge of a thirty-two year old prospective juror. Ruffin argues, therefore, that the state's exclusion of jurors aged twenty-two through thirty-two deprived him of his right to a fair trial. Because Juror 3, rather than the thirty-two year old prospective juror, was brought to the attention of the trial court, we refer in this case to the four jurors cited by McDougal.

[7] A defendant may object to the state's exercise of a peremptory challenge on *Batson* equal protection grounds at any time prior to the swearing in of the jury. *State* v. *Robinson*, 237 Conn. 238, 253, 676 A.2d 384 (1996).

[8] "Once a criminal defendant asserts a *Batson* claim, the prosecution must advance a neutral explanation for the venireperson's removal. . . . The defendant is then afforded the opportunity to demonstrate that the state's articulated reasons are insufficient or pretextual. . . . [T]he trial court then [has] the duty to determine if the defendant has established purposeful discrimination. . . . *Hernandez* v. *New York*, 500 U.S. 352, 363, 111 S. Ct.

believed the juror did not exhibit the requisite maturity. Regarding the state's challenge of Juror 3, the court accepted the state's proffered explanation that the juror's attire showed a lack of maturity. In ruling on the state's challenge of Juror 4, however, the trial court stated: "I'm going to indicate that at this point the state has manifested what appears to be a decision to exercise peremptory challenges based on age, and I don't wish to jeopardize the entire situation by overlooking the defense objections that this would be an inappropriate exercise of a peremptory challenge by a state's attorney, especially when the defendants are both young men . . . ." The trial court, therefore, sustained the defendants' objection and overruled the state's peremptory challenge of Juror 4. The defendants argue that, under these circumstances, the trial court was required to declare a mistrial and begin jury selection anew.

In *Batson* v. *Kentucky*, supra, 476 U.S. 96, the United States Supreme Court held that the use of peremptory challenges to exclude "a cognizable racial group" from a jury violated the equal protection clause of the United States constitution. That court later explained that this protection concerned the removal of "cognizable groups" by peremptory challenge, but not other groups subject to rational basis review. *J.E.B.* v. *Alabama ex rel. T.B.*, 511 U.S. 127, 143, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994). In extending the "cognizable group" label to gender-based discrimination, the court stated: "All persons, when granted the opportunity to serve on a jury, have the right not to be excluded summarily because of discriminatory and stereotypical presumptions that reflect and reinforce patterns of historical discrimination." Id., 142–43.

---

1859, 114 L. Ed. 2d 395 (1991)." (Citation omitted; internal quotation marks omitted.) *State* v. *Hinton*, 227 Conn. 301, 323, 630 A.2d 593 (1993).

No federal court has held that persons of any age constitute a "cognizable group" under the equal protection clause. See, e.g., *United States* v. *Pichay*, 986 F.2d 1259, 1260 (9th Cir. 1993) ("[n]either the [United States] Supreme Court nor any [C]ircuit [Court of Appeals] has held that the Equal Protection Clause prohibits the government from striking venirepersons on account of youth"); *United States* v. *Jackson*, 983 F.2d 757, 762 (7th Cir. 1993) ("no court has found a Fourteenth Amendment equal protection violation based upon the exclusion of a certain age group from the jury"); *United States* v. *Cresta*, 825 F.2d 538, 539 (1st Cir. 1987) (young persons are not "cognizable group" for *Batson* purposes). Even the "aged" do not constitute a cognizable group. *Massachusetts Board of Retirement* v. *Murgia*, 427 U.S. 307, 313–14, 96 S. Ct. 2562, 49 L. Ed. 2d 520 (1976). We conclude, therefore, that there is no merit to the defendants' claim that their equal protection rights under the federal constitution were violated.

The defendants also rely on article first, § 8, of the Connecticut constitution, to ask that we determine that "young persons" are a cognizable group for jury selection purposes.[9] They claim that the exercise of peremptory challenges against that group violates the defendants' right to a fair trial under the Connecticut constitution.[10] The following factors to the extent applicable are to be used in considering a claim under our state constitution: (1) the text of our constitution; (2) decisions of this court and the Appellate Court; (3) federal precedent; (4) sister state decisions; (5) the history of our constitution; and (6) economic and social

[9] While Ruffin has not provided us with a separate analysis of his claim under the Connecticut constitution; see *State* v. *Francis*, 228 Conn. 118, 122 n.3, 635 A.2d 762 (1993); we rely on McDougal's brief, in which McDougal sufficiently analyzes the claim.

[10] We do not infer from the trial court's overly cautious seating of Juror 4 that it found that young persons are a cognizable group for jury selection purposes.

considerations. *State* v. *Geisler*, 222 Conn. 672, 684–85, 610 A.2d 1225 (1992).

In support of his claim, McDougal cites the one case that supports his position. In *State* v. *Zavala*, 259 N.J. Super. 235, 241, 611 A.2d 1169 (1992), the New Jersey Superior Court held that under article I of the New Jersey constitution, "jury selection based on [a] group bias [against young persons] is constitutionally impermissible because it offends the constitutional guarantee of a fair and impartial trial." That holding is questionable, however, because the decision was criticized in *State* v. *Bellamy*, 260 N.J. Super. 449, 453–57, 616 A.2d 1323 (1992), cert. denied, 133 N.J. 436, 627 A.2d 1141 (1993). The court in *Bellamy* correctly recognized that "to be classified as cognizable . . . a group must be one that has been historically excluded, on the basis of stereotypical prejudices, from full participation in the significant duties and privileges of American citizenship. So judged, we hold that, until demonstrated otherwise, age-defined groups are not cognizable for purposes of impartial jury analysis." Id., 456–57; *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U.S. 432, 441, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985).

McDougal also relies on *People* v. *Bartlett*, 89 Misc. 2d 441, 393 N.Y.S.2d 866 (1977), in which the Supreme Court of New York sustained a challenge to a jury array that excluded persons under age thirty. That case, however, is distinguishable because it concerns the requirement under the sixth amendment to the United States constitution " 'that jury panels be drawn from a source representing a "fair cross section" of the community in which the defendant is tried. *Taylor* v. *Louisiana*, 419 U.S. 522, 536 [95 S. Ct. 692, 42 L. Ed. 2d 690] (1975); *United States* v. *LaChance*, 788 F.2d 856, 864 (2d Cir.), cert. denied, 479 U.S. 883 [107 S. Ct. 271, 93 L. Ed. 2d 248] (1986). . . . [T]he Sixth Amendment guarantees the *opportunity* for a representative jury venire, not a

representative venire itself. *Roman* v. *Abrams*, 822 F.2d 214, 229 (2d Cir. 1987), cert. denied, 489 U.S. 1052 [109 S. Ct. 1311, 103 L. Ed. 2d 580] (1989).' . . . *United States* v. *Jackman*, 46 F.3d 1240, 1244 (2d Cir. 1995)." (Emphasis in original.) *State* v. *Ellis*, 232 Conn. 691, 698–99, 657 A.2d 1099 (1995); see also *State* v. *Faust* 237 Conn. 454, 466, 678 A.2d 910 (1996); *State* v. *McCarthy*, 197 Conn. 247, 253–54, 496 A.2d 513 (1985); *State* v. *Castonguay*, 194 Conn. 416, 430, 481 A.2d 56 (1984). "[I]n holding that petit juries must be drawn from a source fairly representative of the community [the United States Supreme Court] imposed no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population. Defendants are not entitled to a jury of any particular composition, *Fay* v. *New York*, 332 U.S. 261, 284 [67 S. Ct. 1613, 91 L. Ed. 2d 2043] (1947); *Apodaca* v. *Oregon*, 406 U.S. [404, 413, 92 S. Ct. 1628, 32 L. Ed. 2d 184 (1972)] (plurality opinion); but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude *distinctive groups* in the community and thereby fail to be reasonably representative thereof." (Emphasis added.) *Taylor* v. *Louisiana*, supra, 538.

There is a difference between a "distinctive group" regarding the composition of the jury pool and a "cognizable group" for jury selection purposes. "As an evidentiary matter, it is more difficult to establish that a classification is suspect [and, therefore, cognizable] than it is to show that a group is 'distinctive' . . . . See *Cleburne* v. *Cleburne Living Center, Inc.*, [supra, 473 U.S. 445–46]." *State* v. *Tillman*, 220 Conn. 487, 499, 600 A.2d 738 (1991), cert. denied, 505 U.S. 1207, 112 S. Ct. 3000, 120 L. Ed. 2d 876 (1992). Age groups are not subject to heightened judicial scrutiny and, therefore, are not cognizable groups for jury selection purposes.

*United States* v. *Pichay*, supra, 986 F.2d 1260; *United States* v. *Jackson*, supra, 983 F.2d 762.

Our resolution of the defendants' claims does not require us to decide whether young persons are a distinct group subject to the due process right to have jurors chosen from a fair cross section of the community. See *Ford* v. *Seabold*, 841 F.2d 677, 681 (6th Cir.), cert. denied, 488 U.S. 928, 109 S. Ct. 315, 102 L. Ed. 2d 334 (1988); see also *Hamling* v. *United States*, 418 U.S. 87, 137, 94 S. Ct. 2887, 41 L. Ed. 2d 590 (1974). If we were to make such a determination, we would have difficulty defining what age groups are distinct from other age groups. In fact, the defendants have cited different age groups as distinctive. See footnote 6 of this opinion. We would also be required, if possible, to determine by what attitudes, values and experiences some persons are considered young or not young. Age itself is no more instructive in this respect than having blue eyes. A person may be "young at heart" at any age.[11] See *Barber* v. *Ponte*, 772 F.2d 982, 998 (1st Cir. 1985) ("[W]hat is the evidence that the attitudes and thinking of, say, 30 year olds have more in common with 18 year olds than they do with 40 year olds, or for that matter, going to the other end of the scale, that 18 year olds have more in common with 28 year olds than with 16 year olds? How do we know that there should be two groups, 18 to 28 and 28 to 35, or three, or four groups encompassing other boundaries?").

Several state courts have held that the exercise of peremptory challenges against cognizable groups violates the independent right to trial by an impartial jury guaranteed by their respective state constitutions. *People* v. *Wheeler*, 22 Cal. 3d 258, 276–77, 583 P.2d 748, 148 Cal. Rptr. 890 (1978); *Riley* v. *State*, 496 A.2d 997, 1012

---

[11] Some people "may survive to a 105," by being "young at heart." "Young at Heart," lyrics by Carolyn Leigh, music by Johnny Richards (1954).

(Del. 1985), cert. denied, 478 U.S. 1022, 106 S. Ct. 3339, 92 L. Ed. 2d 743 (1986); *State* v. *Neil,* 457 So. 2d 481, 486 (Fla. 1984); *Commonwealth* v. *Soares,* 377 Mass. 461, 486, 387 N.E.2d 499, cert. denied, 444 U.S. 881, 100 S. Ct. 170, 62 L. Ed. 2d 110 (1979); *State* v. *Gilmore,* 103 N.J. 508, 522, 511 A.2d 1150 (1986); *State* v. *Crespin,* 94 N.M. 486, 488, 612 P.2d 716 (1980). The defendants have not, however, provided this court with authority developing the principle that young persons are a cognizable group for jury selection purposes.

Article first, § 8, of the Connecticut constitution guarantees a defendant the right to a public trial by an impartial jury, independent of the federal constitution. *State* v. *Esposito,* 223 Conn. 299, 308, 613 A.2d 242 (1992).

Article first, § 19, of the Connecticut constitution, as amended by article four of the amendments to the constitution, provides in pertinent part: "In all civil and criminal actions tried to a jury, the parties shall have the right to challenge jurors peremptorily, the number of such challenges to be established by law. . . ."[12] Prior to this amendment, this court stated: " '[T]he right to challenge a given number of jurors without showing cause is one of the most important of the rights secured to the accused . . . .' " *DeCarlo* v. *Frame,* 134 Conn. 530, 533, 58 A.2d 846 (1948), quoting *Pointer* v. *United States,* 151 U.S. 396, 408, 14 S. Ct. 410, 38 L. Ed. 208 (1894). We recently stated that article first, § 19, reflects that "peremptory challenges occupy a special position in this state's jurisprudence." *State* v. *Day,* 233 Conn. 813, 845, 661 A.2d 539 (1995); see also General Statutes § 52-540.

In adhering to the difference between a "distinctive group" and a "cognizable group," we recognize the pro-

---

[12] We have found that the right to challenge jurors peremptorily is contained in the text of only one other state constitution. La. Const., art. I, § 17.

tections of the due process and equal protection clauses of the federal constitution. In balancing the important right of peremptory challenges against the right to have a jury selected in a nondiscriminatory fashion, the United States Supreme Court has determined that the right of peremptory challenges gives way only when challenges are exercised to exclude a cognizable group from a petit jury. *J.E.B.* v. *Alabama ex rel. T.B.*, supra, 511 U.S. 143; *Batson* v. *Kentucky*, supra, 476 U.S. 90–93; *Swain* v. *Alabama*, 380 U.S. 202, 214–24, 85 S. Ct. 824, 13 L. Ed. 2d 759 (1965). Given the unique role of peremptory challenges in this state, we cannot say that the balance should be struck differently under our constitution. We conclude, therefore, that the exercise of peremptory challenges against "young persons" would not violate the defendants' right to due process under the Connecticut constitution.

### III

In his appeal, Ruffin further claims that the trial court failed to require the state to specify the manner in which he was alleged to have committed manslaughter in the first degree. We disagree.

Ruffin filed a motion for a bill of particulars, pursuant to Practice Book § 832,[13] requesting, inter alia, information specifying the conduct and acts of the defendant that allegedly constituted the offense. Thereafter, the state filed a bill of particulars stating that the offense of manslaughter in the first degree; General Statutes §§ 53a-55 (a) (3) and 53a-8 (a);[14] occurred on July 3,

---

[13] Practice Book § 832 provides: "The judicial authority shall order that a bill of particulars disclose information sufficient to enable the defendant to prepare his defense, including but not being limited to reasonable notice of the crime charged and the date, time, and place of its commission."

[14] General Statutes § 53a-8 (a) provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

1993, at or about 7 p.m., in Southfield Village, and resulted in the death of Jasmine Merced. Ruffin objected to the bill of particulars, arguing that he was entitled to know if the state intended to prove that he had fired a gun in the commission of the offense. The trial court, however, did not require the state to disclose such information.

"The sixth amendment to the United States constitution and article first, § 8, of the Connecticut constitution guarantee a criminal defendant the right to be informed of the nature and cause of the charges against him with sufficient precision to enable him to meet them at trial. *State* v. *Cates*, 202 Conn. 615, 625–26, 522 A.2d 788 (1987); *State* v. *Franko*, 199 Conn. 481, 490, 508 A.2d 22 (1986); *State* v. *Stepney*, 191 Conn. 233, 240, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772 (1984). *State* v. *Laracuente*, 205 Conn. 515, 518, 534 A.2d 882 (1987), cert. denied, 485 U.S. 1036, 108 S. Ct. 1598, 99 L. Ed. 2d 913 (1988). When the state's pleadings have informed the defendant of the charge against him with sufficient precision to enable him to prepare his defense and to avoid prejudicial surprise, and were definite enough to enable him to plead his acquittal or conviction in bar of any future prosecution for the same offense, they have performed their constitutional duty. . . . *State* v. *Spigarolo*, 210 Conn. 359, 381, 556 A.2d 112, cert. denied, 493 U.S. 933, 110 S. Ct. 322, 107 L. Ed. 2d 312 (1989); see *State* v. *Morrill*, 197 Conn. 507, 551, 498 A.2d 76 (1985); *State* v. *Vincent*, 194 Conn. 198, 205, 479 A.2d 237 (1984); *State* v. *Killenger*, 193 Conn. 48, 55, 475 A.2d 276 (1984); *State* v. *Roque*, 190 Conn. 143, 154, 460 A.2d 26 (1983).

"[T]he denial of a motion for a bill of particulars is within the sound discretion of the trial court and will be overturned only upon a clear showing of prejudice to the defendant. . . . *State* v. *Spigarolo*, supra, [210 Conn.] 385; *State* v. *Laracuente*, supra, [205 Conn.] 519.

A defendant can gain nothing from [the claim that the pleadings are insufficient] without showing that he was in fact prejudiced in his defense on the merits and that substantial injustice was done to him because of the language of the information. *State* v. *Rafanello*, 151 Conn. 453, 457, 199 A.2d 13 (1964) . . . . *State* v. *Spigarolo*, supra, 382." (Internal quotation marks omitted.) *State* v. *Kyles*, 221 Conn. 643, 652–53, 607 A.2d 355 (1992).

Ruffin claims that he was prejudiced by the court's refusal to order the state to specify the manner in which he allegedly committed manslaughter in the first degree. He argues that if the state were not alleging that he himself used a firearm, he would have filed a motion to dismiss the charge. It is undisputed, however, that before trial Ruffin had reviewed the state's files and the witnesses' pretrial statements. Ruffin was, therefore, aware that those accounts did not indicate that he himself had fired a weapon at the Southfield Village courtyard where Jasmine Merced was killed.

"[T]his court has on numerous occasions adverted to sources extrinsic to the specific count or information to determine whether the defendant was sufficiently apprised of the offense charged. See, e.g., *State* v. *Frazier*, [194 Conn. 233, 237, 478 A.2d 1013 (1984)] (defendant sufficiently apprised where he had access to state's file, police reports and demonstrative evidence); *State* v. *Beaulieu*, 164 Conn. 620, 626, 325 A.2d 263 (1973) (information supplied by another count, state's attorney and court); see also *State* v. *Moffett*, 38 Conn. Sup. 301, 310, 444 A.2d 239 (1981) (defendant's access to prosecution file)." *State* v. *Spigarolo*, supra, 210 Conn. 384.

Because he had access to all the witnesses' statements and the bill of particulars specified he was being charged as an accessory, Ruffin knew that the nature

of the charge against him was as an accessory. Moreover, he was acquitted of this charge. Under the circumstances, we cannot conclude that the trial court abused its discretion to the prejudice of Ruffin.

## IV

Ruffin finally argues that the trial court engaged in a prejudicial pattern of misconduct that demonstrates a bias against him. He claims that the court, therefore, deprived him of his right to a fair trial. Ruffin asserts that the trial court, outside of the presence of the jury, referred to the defendants as "cowards" and "animals" and did not allow defense questions of prospective jurors and witnesses in the absence of objections by the state. Ruffin maintains that these actions assume significance when considered in conjunction with the court's adverse rulings on the bill of particulars, the state's amendment of the information and the admissibility of *Whelan* statements. Ruffin did not raise this claim before the trial court and seeks review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[15]

" 'Due process of law guarantees a criminal defendant a fair trial before an impartial judge and jury in a neutral atmosphere. U.S. Const., amend. XIV; Conn. Const., art. I, § 8. *State* v. *Fernandez*, 198 Conn. 1, 10, 501 A.2d 1195 (1985); *State* v. *Gordon*, 197 Conn. 413, 424D, 504 A.2d 1020 (1985).' *State* v. *Smith*, 200 Conn. 544, 549, 512 A.2d 884 (1986)." *State* v. *Cruz*, 212 Conn. 351, 364, 562 A.2d 1071 (1989). We have carefully reviewed the

---

[15] "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." *State* v. *Golding*, supra, 213 Conn. 239–40.

record to ensure that Ruffin received a fair trial before the trial judge, and we conclude that Ruffin's claim is without merit.

The trial court did not, as claimed, describe the defendants as "cowards" and "animals." The record reveals, instead, that the court used these terms when Dix refused to testify despite a grant of immunity by the state. When it stated that "cowards" and "animals" had engaged in a shooting in Southfield Village, the court was explaining to Dix the consequences of her refusal to testify and that it was required to take some action under the circumstances. The court told Dix that she was obligated to testify if she had information concerning these crimes. The court did not identify the defendants as "cowards" and "animals," but commented, in considering Dix's refusal to testify, on the nature of the offenses. After the court gave Dix several days to consider her decision, it sentenced her to six months imprisonment for her continued refusal to testify.

Ruffin also argues that the trial court prevented him from questioning prospective jurors and witnesses when the state had not objected to defense counsel's questions. "The trial judge has the responsibility for safeguarding both the rights of the accused and the interests of the public in the administration of criminal justice. The adversary nature of the proceedings does not relieve the trial judge of the obligation of raising on his or her initiative, at all appropriate times and in an appropriate manner, matters which may significantly promote a just determination of the trial. . . . [I]t is appropriate for the trial judge from time to time to intervene in the conduct of a case." (Internal quotation marks omitted.) *State* v. *Fernandez*, supra, 198 Conn. 11; *People* v. *Yut Wai Tom*, 53 N.Y.2d 44, 56, 422 N.E.2d 556, 439 N.Y.S.2d 896 (1981). We hold that the trial judge's conduct here was appropriate.

Ruffin has made no claim that the evidentiary rulings or permitting the amendment of the information were improper. We have, as appears above, also found no abuse of discretion by the trial court in its rulings concerning the state's bill of particulars and the admissibility of the *Whelan* statements.

Accordingly, we conclude that the trial court did not evince a bias against Ruffin. The record demonstrates that Ruffin received a fair trial presided over by an impartial judge in a patient and evenhanded manner. Ruffin's claims, therefore, are without merit.

The judgment is affirmed.

In this opinion NORCOTT, J., concurred, and PALMER, J., concurred as to parts II, III and IV and concurred in the result as to part I.

BERDON, J., with whom, KATZ, J., joins, concurring[1] and dissenting. The mere fact that there is sufficient evidence to support the four factors required for a *Whelan*[2] statement to be admissible does not end the trial court's inquiry: the trial court, of course, must first make a preliminary determination that the statement is *reliable*. Otherwise, the hearsay statement of a witness would be admissible for substantive purposes even if the statement was extracted from the witness by means of the rack and the screw.[3]

---

[1] I agree with the resolution of the issues in parts II, III and IV of the majority opinion.

[2] *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).

[3] "In *Whelan*, we adopted the rule allowing the substantive use of a prior inconsistent statement if: (1) the statement is in writing; (2) it is signed by the declarant; (3) the declarant has personal knowledge of the facts set forth in the statement; and (4) the declarant testifies at trial and is subject to cross-examination." *State* v. *Hopkins*, 222 Conn. 117, 123, 609 A.2d 236 (1992), citing *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).

This gatekeeper function of the trial court, with respect to a *Whelan* statement, takes on great significance in view of *State* v. *Newsome*, 238 Conn. 588, 682 A.2d 972 (1996), wherein this court held that a conviction can rest solely on a single out-of-court, inconsistent statement. As a result of this court's willingness to allow a conviction to stand solely or in part on evidence that in any given case can be unreliable, the trial court must be required to closely scrutinize the *Whelan* hearsay statement by independently determining its reliability out of the presence of the jury, before admitting it into evidence. Of course, once the trial court makes its determination of reliability, and concludes that the four *Whelan* factors have been satisfied, then the issue is one for the jury. In this case, notwithstanding the majority's claim to the contrary, the trial court failed to conduct this exacting scrutiny in order to ensure a reliable verdict.

In *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), this court alluded to the requirement that the trial court must first make a determination that the statement was made without coercion, influence or deception.[4] I thought we made this crystal clear in *State*

---

[4] Just recently, our Appellate Court underscored the importance of the finding of reliability by the trial court by upholding a trial court's refusal to admit a *Whelan* statement for substantive purposes because the defendant offered no evidence of its reliability, in a situation where the statement was offered for the purpose of contradicting a key state's witness. In *State* v. *Davis*, 32 Conn. App. 21, 37, 628 A.2d 11 (1993), the court upheld the trial court's refusal to admit a statement of a witness given to the Florida police that was offered by the defendant because the trial court "determined that in the absence of testimony from the Florida police describing the procedure used in taking the statement, [the] evidence lacked sufficient reliability." In *Davis*, not only did the court conclude that a *Whelan* statement is subject to a judicial determination of reliability, but also that a criminal defendant who offers such a statement into evidence has the burden of going forward with evidence to prove its reliability. See id., 37–38. In this case, the defendant does not raise the issue of the burden of proof with respect to the reliability of the *Whelan* statement.

v. *Grant*, 221 Conn. 93, 602 A.2d 581 (1992), wherein the trial court had articulated its specific reasons as to the statement's reliability. In *Grant*, we stated that "a prior inconsistent statement had to be given under circumstances ensuring its reliability and trustworthiness in order to be admissible [for substantive purposes]." Id., 100; see also *State* v. *Hopkins*, 222 Conn. 117, 126, 609 A.2d 236 (1992) ("[i]t is the trial court's responsibility to weigh the reliability of each statement on a case-by-case basis"). We emphasized the need for the trial court's preliminary finding of reliability in *State* v. *Borrelli*, 227 Conn. 153, 160, 629 A.2d 1105 (1993), wherein we stated that "the trial court reasonably found sufficient indicia of reliability in the circumstances surrounding the victim's statement to uphold its admission for substantive purposes." See also C. Tait & J. LaPlante, Connecticut Evidence (Sup. 1996) § 11.24.1, p. 222 ("[u]nder *Whelan*, the prior inconsistent statement must have been given under circumstances ensuring its reliability and trustworthiness before it can be admitted for substantive purposes").[5]

The majority recognizes that "[b]efore admitting a *Whelan* statement for substantive purposes, the trial court must determine that the statement was made under conditions deemed to render [it] equal in reliability and trustworthiness to those made under the sanction of an oath and the test of cross-examination."

---

[5] See also *State* v. *Fleming*, 36 Conn. App. 556, 561, 651 A.2d 1341, cert. denied, 233 Conn. 913, 659 A.2d 186 (1995) ("[t]he admission for substantive purposes of a prior inconsistent statement is limited to situations where the likelihood of fabrication is slight and the risk of coercion, influence or deception is greatly reduced" [internal quotation marks omitted]); *In re Bassel C.*, 33 Conn. App. 90, 94–95, 633 A.2d 733 (1993) ("the trial court must reasonably find sufficient indicia of reliability in the circumstances surrounding the statement to admit it substantively"); *State* v. *Wager*, 32 Conn. App. 417, 428, 629 A.2d 1146, cert. denied, 228 Conn. 912, 635 A.2d 1231 (1993) ("[the] cases have emphasized that to be admissible as substantive evidence, a prior inconsistent statement must have been made under circumstances that reasonably ensured reliability and trustworthiness").

(Internal quotation marks omitted.) The majority, however, pays lip service to this fundamental rule by ignoring the facts of this case.

In this case, the trial court obviously determined that it had no part to play in determining the reliability of the statement. Once the trial court determined that there was sufficient evidence to support the four *Whelan* factors, it decided that the issue of reliability was solely the concern of the jury. The defendants attempted to introduce evidence before the trial court, in the absence of the jury, regarding the out-of-court inconsistent statement given to the police by one of the witnesses, Nancy Thompson. At one point, defense counsel asked Thompson, "[d]id you make this statement voluntarily, did you make it of your own free will?" Thompson responded, "[n]o." Even with this answer, the trial court foreclosed further inquiry into the circumstances surrounding the out-of-court statement.[6] Defense counsel attempted to voir dire Thomp-

---

[6] For example, during the preliminary examination, out of the presence of the jury, the following colloquy occurred regarding the admissibility of Thompson's out-of-court statement:

"Mr. Russell [Counsel for the defendant John Ruffin]: Did [the police] tell you what would happen to you if you didn't sign the statement?

"Mr. Bernardi [Assistant State's Attorney]: Your Honor, I'm going to object at this point.

"The Court: What's the claim? This is on the question of whether or not this document qualifies under *Whelan*.

"Mr. Russell: Yes.

"The Court: It's not a *Miranda* issue.

"Mr. Russell: Well Your Honor, if the statement is either coerced or is in any other way not—it's not—this is not—

"The Court: That's why she's here for cross-examination. Will you stick to the issue as to whether or not this document qualifies under *Whelan*? . . .

"Let me put the burden on the state.

"Mr. Bernardi: It's signed and it's in writing.

"The Court: I can't hear you.

"Mr. Bernardi: It's signed and it's in writing, and that's the minimal qualifications—

"The Court: No give me—there are four reasons. . . .

"Mr. Bernardi: It's also—

son about the circumstances surrounding her statement to the police. Defense counsel, had he been allowed to continue the voir dire, would have presented evidence

"The Court: Four reasons for the admission of the document under *Whelan*.

"Mr. Bernardi: Well, it's—

"The Court: Will you address the four issues?

"Mr. Bernardi: It is inconsistent, Your Honor, with the testimony that she—

"The Court: Wait a minute. Let him—he's looking it up.

"Mr. Bernardi: It is in writing. It is signed, and it is under oath. So, under that standard, Your Honor, the state—As a matter of fact, here's a copy of the case. Counsel's . . . .

"Those are the standards for *Whelan*?

"The Court: Do you wish to be heard on this claim on the standards for *Whelan*?

"Mr. Russell: Well, Your Honor, I think that the standards for *Whelan*—

"Mr. Bernardi: And that she has personal knowledge of the facts, which she—thank you, Your Honor—everything she has testified to in that document—she indicates she was present for—what I'm attempting to introduce.

"Mr. Russell: Respectfully, Your Honor.

"The Court: Yes.

"Mr. Russell: Now that the state has stated the four elements required under *Whelan*, I would submit that *Whelan* sets the floor on the minimum standards for the admissibility of a statement.

"If I'm permitted to continue with my examination, outside the presence of the jury—

"The Court: The final aspect is that the witness is available for cross-examination, which is the function of the questions that you are asking as to whether or not what she recollects now and testifies [to] now is correct, or whether what she recollected then and testified [to] then is correct.

"And you have the opportunity to cross-examine the witness.

"Mr. Russell: Well, respectfully, Judge—

"The Court: I want you to limit yourself to the issue as to whether or not this document qualifies under [*Whelan*].

"Mr. Russell: It seems to.

"The Court: And if it does, I'll admit it—

"Mr. Russell: If it—

"The Court: And then you can cross-examine the witness.

"Mr. Russell: If it is, in fact, and it's not at all clear, if it is in fact, a statement, meaning something said by this witness. And what I was trying to elicit was that fundamentally, even though the four facial requirements with respect to the admissibility of a document may be met, in this instance, I would submit that these questions and answers will show that this is not a statement by this witness.

"The Court: Objection overruled.

"Mr. Russell: Exception."

to show that the police had hounded Thompson for months in order to extract a statement from her, that the police eventually went to her home, placed her in a police car and brought her to the police station, and that, once at the station, they had placed Thompson in a room in the detective bureau and threatened and intimidated her. Defense counsel also argues that he should have been allowed to pursue this line of questioning because, after the prior inconsistent statement was admitted, it was elicited on cross-examination that the police had lied to Thompson to get her to go to the police station, and that they threatened her with arrest and prosecution on charges stemming from the homicide in this case if she did not make a written statement.[7]

---

[7] In his concurrence, Justice Palmer, obviously uncomfortable with the majority opinion, states that the admission of Thompson's statement was harmless, notwithstanding his characterization that the trial court "unduly truncated" defense counsel's voir dire examination regarding the *Whelan* statement. The bottom line of his concurrence is that "[b]ecause the investigative techniques allegedly employed by the police were entirely legitimate, it cannot reasonably be argued that [Thompson's] statement was the product of duress, coercion or undue pressure such that the statement's reliability might seriously be called into question." I cannot agree that the police tactics were legitimate and that there was no undue pressure placed on Thompson. It appears that Justice Palmer would find the statement unreliable only if it was extracted by means of "death threats or torture." Justice Palmer takes too narrow a view of what transpired with respect to how the police acquired the statement from Thompson. Contrary to his assertion, it is more than reasonable to conclude that Thompson was subjected to undue pressure by being threatened with arrest and prosecution on charges stemming from the homicide that occurred in this case. The transcript reveals the following colloquy during cross-examination of Thompson in the presence of the jury, after the statement was admitted:

"[Mr. Russell, Counsel for the defendant John Ruffin]: Did they say that anything would—did [the police officer] say that anything would happen to you if you did not cooperate with his investigation?

"[Nancy Thompson]: The only thing he said was that people wrote statements down that I was down with Nation and all this *and I could get charged with all that other stuff.*

"Q. That you would be prosecuted for being involved with the Nation?

"A. Yeah. That people was right saying that I was down with Nation and [a] lot of stuff he was saying.

"Q. Did you cooperate—did you sign the statement that the state has

Notwithstanding that the record clearly indicates that the trial court would not hear any evidence pertaining to reliability, the majority claims that the trial court in

introduced into evidence because you were afraid that if you didn't sign it, that [the police officer] was going to place you under arrest for being involved with what he called the Nation?

"A. Yeah.

"Q. Okay. And how many statements did he say he had signed against you involving you in criminal activity?

"A. Only thing he was saying was that Torik [Baldwin, a coconspirator] was writing statements and [the defendant John Ruffin], *that wrote alibis down and stuff saying that I was with him—some other stuff they was saying.*

"Q. *Okay. And based upon that, were you afraid that you were going to be arrested?*

"A. *Yeah.*" (Emphasis added.)

Again, on redirect examination by the state, Thompson was asked whether she had given a statement to the police and she replied: "After they done told me all that about saying I was down with Nation, *saying that they were going to charge me for all that other stuff.*" (Emphasis added.)

Furthermore, in his concurrence Justice Palmer principally relies on Thompson's direct testimony before the jury by stating "that she had attempted to be truthful and accurate when she provided the statement." An examination of the colloquy in the transcript upon which Justice Palmer relies reveals the following:

"[Mr. Bernardi, Assistant State's Attorney]: And at the time that you [provided the statement] to the police, you were doing your best to be truthful, were you not?"

"[Nancy Thompson]: I was—I don't know.

"Q. Excuse me?

"A. What?

"Q. I didn't hear what it is that you had to say?

"The Court: Ask the question over again, please.

"Q I said, at the time that you gave your statement to the police, you were attempting to be as truthful as you could, were you not?

"A. Yeah.

"Q. And you were attempting to be as accurate as you could, were you not?

"A. Yeah." In view of the entire transcript with respect to this witness, no experienced trial judge would conclusively determine reliability based upon these monosyllabic responses.

The hindsight determination by Justice Palmer, in his concurrence, of the reliability of Thompson's *Whelan* statement, based upon what came to light in the presence of the jury, condones the type of gamble that the trial court improperly took in this case when it assumed the reliability of the statement. The fact remains that the trial court did not make a preliminary determination of reliability before the statement was admitted into evidence.

fact made a determination of reliability. The majority bases this claim on quotations from the transcript and indicates that "the [trial] court explicitly acknowledged the requirement that the statement be given under circumstances where the 'likelihood of fabrication is slight and the risk of coercion, influence or deception is greatly reduced' and that 'the trial court must reasonably find sufficient indicia of reliability in the circumstances surrounding the statement to admit it substantively.'" These quotations relied on by the majority were not the words of the trial court, but, rather, they came from *defense counsel's argument* to the trial court that he should be allowed to elicit evidence of unreliability.

Indeed, the pages of the transcript relied upon by the majority to support its claim reveal the following colloquy:

"Mr. Russell [Counsel for the defendant John Ruffin]: Can I be heard, respectfully, Judge? While this was getting organized, [Monte P. Radler, Assistant Public Defender] was kind enough to bring to my attention the case of [*In re Bassel C.*, 33 Conn App. 90, 633 A.2d 733 (1993), which] interprets [*Whelan*], and cites [its] requirements. And then indicates, citing other authority that prior inconsistent statements are admissible only where the likelihood of fabrication is slight and the risk of coercion, influence or deception is greatly reduced.

"And then that goes on to cite *State* v. *Grant*, [supra, 221 Conn. 93] et cetera. This authority seems to clearly qualify [*Whelan*]. And it goes on to state that the trial court must reasonably find sufficient indicia of reliability in the circumstances surrounding the statement to admit it substantively. And it is the trial court's responsibility to weigh the reliability of each statement on a case-by-case basis.

"So we're asking the court to use its discretion in this instance, and to permit an inquiry, perhaps tomorrow.

"The Court: I did—

"Mr. Russell: As taken—

"The Court:—take into consideration, in response to your own very questioning. Can I see the [*Whelan*] statement, please?

"Mr. Russell: Had I been permitted to proceed—

"The Court: She was—pardon me. She was asked if—with regard to the waiver, [reading from the *Whelan* statement] 'I waive this statement freely and voluntarily, without fear of threat or inducement by a promise. And I wish to do so without the presence of an attorney.

" 'I have read or had read to me the above listed rights I am entitled to under the constitution of the United States.' She indicated that portion was read to her by an officer who's name she forgot, or didn't recollect.

"She also said that she was asked to read the provision of [General Statutes § 53a-157] with regard to the truthfulness of the statements, and she said she did read it.

"Mr. Russell: Respectfully, Judge, had I been allowed to continue, I think we would have learned that she was put into a—the police came to her home, put her into a police car, brought her to a police station, put her into a room in a detective bureau, and threatened and intimidated her. And had already prepared at least some portions of this statement before her arrival there.

"I think that would be elicited had I been allowed to go on.

"The Court: Fine. That's the purpose of cross-examination. It's up to the jury to determine whether they

will believe what she said now, or whether they will believe what she said then—

"Mr. Russell: Exception please.

"The Court: And to take into consideration the questions of voluntariness.

"Mr. Russell: Exception please.

"Mr. Skovgaard [Counsel for the defendant Charles McDougal]: Exception please.

"The Court: As you said, in reading that quotation—read the quotation [from the case] again.

"Mr. Russell: 'Only admissible where the likelihood of fabrication is slight, and the risk of coercion, influence or deception is greatly reduced.'

"The Court: Greatly reduced.

"Mr. Russell: Greatly reduced?

"The Court: Yes.

"Mr. Russell:—And 'the citation's omitted, the trial court must reasonably find sufficient indicia of reliability in the circumstances surrounding the statement to admit it substantively.'

"The Court: All right. I find that as a result of the questioning that you brought out, it's at this point adequate to go before the jury. You have a right on cross-examination as in any jury trial, and the jury has the right to consider the degree of weight they will give to any statement, and whether they're going to credit anything.

"But anyway, you'll have that opportunity when it comes time for your cross-examination of the witness.

"Mr. Russell: Okay, I'm not in a hurry, Judge. Thank you."

It is clear from this colloquy that any finding of reliability made by the trial court, if one was made, was based merely on the *Whelan* statement itself. In other words, the out-of-court statement was determined to be reliable because certain clauses in the statement indicated that it was reliable. I cannot accept this circular reasoning. The trial court foreclosed the defendant from eliciting testimony regarding the circumstances surrounding the statement and made a determination of its admissibility based upon less than all of the evidence necessary to make a proper determination.

In addition, the defendants claim that the statement given by another witness, Ebony Phillips, was also not evaluated by the trial court, aside from a mechanistic application of the four *Whelan* factors, as to the statement's reliability. The defendants argue that if they had been permitted to, they would have elicited evidence that Phillips' statement was given long after the events in question had occurred, that it was written by one of the police officers, and that Phillips was unable to read or explain the meaning of parts of her written statement. Surely, if the defendants could establish the above as facts, the reliability of both statements would be suspect.[8]

The trial court rejected its gatekeeper role of excluding unreliable *Whelan* statements, a role that this court made clear in *Whelan* itself, and then subsequently in *Grant, Hopkins*, and *Borrelli*. The trial court clearly

---

[8] Indeed, in this case, the principal purpose of *Whelan* is undermined. In *Whelan*, the court justified, in part, the rule as to the admissibility of prior inconsistent statements based upon the fact that the statements are "made closer to the event in question, when memories are fresher . . . ." *State* v. *Whelan*, supra, 200 Conn. 750; see also *State* v. *Woodson*, 227 Conn. 1, 20, 629 A.2d 386 (1993). In this case, both statements were extracted by the police long after the events they purported to witness had occurred. Both statements were taken in May, 1994, and the crime was committed on July 3, 1993. This, of course, would be an important factor to consider with respect to reliability.

was under the impression that if, at the preliminary hearing on the admissibility of the *Whelan* statements, there was sufficient evidence to establish the four *Whelan* factors—the statement was in writing, it was signed by the declarant, the declarant had personal knowledge of the facts set forth in the statement, and the declarant testifies at trial and is subject to cross-examination—then any issue of unreliability could be elicited through cross-examination and was for the jury to consider.

The Appellate Division of the New Jersey Superior Court has held that, before a prior inconsistent statement can be admitted under New Jersey's *Whelan*-type codified rule of evidence, "[t]he [r]ule calls for all the relevant 'circumstances' surrounding the prior inconsistent statement to be evaluated in determining whether its 'reliability' has been sufficiently established." *State* v. *Gross*, 216 N.J. Super. 98, 108, 523 A.2d 215 (1987), aff'd on other grounds, 121 N.J. 1, 577 A.2d 806 (1990);[9]

---

[9] In *Gross*, the Appellate Division of the New Jersey Superior Court set forth a litany of considerations for a trial court to consider before admitting a prior inconsistent statement of a witness as substantive evidence before a jury: "We cannot catalog all of the 'circumstances' which may bear upon the reliability of a statement offered under [rule 63 (1) (a) of the New Jersey Rules of Evidence]. Certainly they include such considerations as (1) the declarant's connection to and interest in the matter reported in the out-of-court statement, (2) the person or persons to whom the statement was given, (3) the place and occasion for giving the statement, (4) whether the declarant was then in custody or otherwise the target of investigation, (5) the physical and mental condition of the declarant at the time, (6) the presence or absence of other persons, (7) whether the declarant incriminated himself or sought to exculpate himself by his statement, (8) the extent to which the writing is in the declarant's hand, (9) the presence or absence, and the nature of, any interrogation, (10) whether the offered sound recording or writing contains the entirety, or only a portion or a summary, of the communication, (11) the presence or absence of any motive to fabricate, (12) the presence or absence of any express or implicit pressures, inducements or coercion for the making of the statement, (13) whether the anticipated use of the statement was apparent or made known to the declarant, (14) the inherent believability or lack of believability of the statement and (15) the presence or absence of corroborating evidence." *State* v. *Gross*, supra, 216 N.J. Super. 109–110.

see also *State* v. *Mancine*, 124 N.J. 232, 248, 590 A.2d 1107 (1991) (adopting *Gross* factors). In *Gross*, the court stated that "[a]ll of the relevant circumstances should be explored at a hearing conducted pursuant to [rule 8 of the New Jersey Rules of Evidence] out of the presence of the jury. The role of the trial judge at that preliminary inquiry is not to determine the credibility of the out-of-court statement. Rather it is for the judge to determine from the proofs whether the prior statement was made or signed under circumstances establishing sufficient reliability that the factfinder may fairly consider it as substantive evidence." *State* v. *Gross*, supra, 110; see also *State* v. *Nelson*, 74 Wash. App. 380, 387, 874 P.2d 170 (1994) (holding, with respect to evaluation that trial court must conduct before prior inconsistent statement can be admitted into evidence for substantive purposes pursuant to that state's statute, that "[t]he purposes of the rule and the facts of each case must be analyzed. In determining whether evidence should be admitted, reliability is the key." [Internal quotation marks omitted.]). *Whelan* and its progeny require no less.

It is clear to me that the defendants in the present case were prejudiced by the prior inconsistent statements. There was no testimony to corroborate Thompson's prior statement concerning the alleged presence of guns in the car in which the defendants were traveling, aside from the testimony of a participating accomplice who entered into a plea bargain with the state in exchange for his testimony. In her statement, Thompson alleged that there were several guns in the car, specifically, one large gun in a carrying bag, and several smaller guns underneath the bag on the floor near the rear seat. In contrast, in her trial testimony Thompson stated: "[I saw] [s]omething in a pouch [in the back seat] . . . I don't know what was in it, but it looked like a gun . . . [and] it sounded like something was underneath it. But

I'm not sure . . . because I didn't see what was underneath it." In addition, Phillips' prior statement clearly stated that she saw several men with guns and that they were shooting, while her trial testimony indicated that she had heard guns firing but that she did not see anyone shooting or carrying guns. The importance of the testimony of Thompson and Phillips is underscored in this case by the fact that their testimony was the only testimony that the jury requested to have read back to it during deliberations, and their testimony was central to the state's case.

I would remand this case to the trial court for an evidentiary hearing on the *Whelan* statements, in order for the trial court to be given the opportunity to determine whether they are reliable in the first instance.[10]

Accordingly, I disagree with part I of the majority opinion.

PALMER, J., concurring. I join in parts II, III and IV of the majority opinion. I concur separately with respect to part I, however, because I believe that the trial court unduly limited the voir dire examination of Nancy Thompson by the defendants, Charles McDougal and John Ruffin, relative to the admissibility of her prior inconsistent statement under *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), and its progeny. Nevertheless, I am convinced that, in the circumstances of this case,

---

[10] What is particularly troubling to me is that by simply remanding this matter to the trial court for an evidentiary hearing, in order for a determination to be made as to whether Thompson's and Phillips' *Whelan* statements were made under circumstances that show that they are reliable, we could be assured that their convictions were predicated on reliable evidence. That seems but a small price to pay in judicial time, in light of the fact that an affirmance of these convictions will mean a loss of liberty of forty years for Ruffin and twenty years for McDougal.

the trial court's improper application of *Whelan* was harmless.

Before endeavoring to explain why, in my judgment, the defendants' voir dire examination of Thompson regarding her prior inconsistent statement was unduly truncated, I believe that it is necessary first to make explicit what is implicit both in the majority opinion and in our cases following *Whelan*, namely, that a trial court, before admitting into evidence a statement that satisfies the four *Whelan* conditions,[1] still must determine whether that statement is *sufficiently reliable to be admitted as substantive evidence.*[2] In other words, the *Whelan* criteria constitute a minimum threshold that must be met in order for the prior inconsistent statement to be admitted. Although it is true that, in the vast majority of cases, compliance with the *Whelan* conditions will suffice to satisfy the reliability requirement,[3] a case may arise in which the *Whelan* conditions

[1] "In *Whelan*, we adopted the rule allowing the substantive use of a prior inconsistent statement if: (1) the statement is in writing; (2) it is signed by the declarant; (3) the declarant has personal knowledge of the facts set forth in the statement; and (4) the declarant testifies at trial and is subject to cross-examination." *State* v. *Hopkins*, 222 Conn. 117, 123, 609 A.2d 236 (1992); see also *State* v. *Borrelli*, 227 Conn. 153, 158–59, 629 A.2d 1105 (1993). We have held "that a tape recording of a prior statement may be admitted even though it was not signed because the recording of the witness' voice imparts the same measure of reliability as a signature." (Internal quotation marks omitted.) *State* v. *Borrelli*, supra, 158–59 n.5.

[2] I disagree with the dissent's suggestion that such a requirement was made clear in *State* v. *Grant*, 221 Conn. 93, 100, 602 A.2d 581 (1992). Although we consistently have indicated that reliability is the critical factor in determining whether a declarant's prior inconsistent statement may be admitted for substantive purposes, we also have suggested that satisfaction of the four *Whelan* conditions is the sine qua non of reliability. Indeed, the difficulty encountered by the able trial court in this case in attempting to apply the principles enunciated in *Whelan* and its progeny suggests that we heretofore have not made our applicable principles sufficiently clear.

[3] As we stated in *Whelan*, "[a]lthough the requirement that prior statements be written and signed by the declarant is not an absolute guaranty of reliability, it does provide significant assurance of an accurate rendition of the statement and that the declarant realized it would be relied upon." *State* v.

have been met, but the circumstances under which the witness gave the statement were so coercive as to render it inherently unreliable. For example, if a trial court were to find that a prior written statement that was inconsistent had been extracted from a witness by death threats or torture, the court undoubtedly would preclude the state from introducing the statement even though it had been signed by the witness, the witness had personal knowledge of the facts stated therein, and the witness testified at trial and was subject to cross-examination.

Because a statement that satisfies the *Whelan* conditions nevertheless may be unreliable and, therefore, inadmissible, a party opposing the admission of the statement on such grounds must be afforded a meaningful opportunity to adduce facts in support of that claim. Indeed, that is what the defendants sought to do in this case when, out of the presence of the jury and prior to the court's ruling on the admissibility of Thompson's prior inconsistent statement, defense counsel asked Thompson, "Did [the police] tell you what would happen to you if you didn't sign the statement?" Upon objection by the state, and after the trial court had indicated that the question was beyond the scope of the inquiry contemplated by *Whelan*, the defendants stated that the witness would have testified that she was "threatened and intimidated" into providing the statement. A statement that has been obtained by such means might not be sufficiently reliable for use as substantive evidence, notwithstanding its compliance with the four *Whelan* criteria. Consequently, I believe that the trial court should have allowed Thompson to answer the question regarding such alleged threats and intimi-

---

*Whelan*, supra, 200 Conn. 754; see also *State* v. *Grant*, 221 Conn. 93, 100, 602 A.2d 581 (1992). We further noted that "the likelihood of fabrication is slight and the risk of coercion, influence or deception is greatly reduced" when the four *Whelan* conditions have been met. *State* v. *Whelan*, supra, 753.

dation.[4] A careful examination of the record, however, reveals that the trial court's failure to allow the defendants to question Thompson about the allegedly coercive circumstances surrounding her statement was harmless because the evidence adduced during the trial demonstrates convincingly that Thompson's statement was sufficiently reliable so as to render it admissible for substantive purposes.[5]

Thompson first was examined by the state in the presence of the jury. She testified that she actually had made the comments to the police contained in the statement and that she *had attempted to be truthful and accurate* when she provided the statement. Because her trial testimony differed in certain respects from the written statement that she previously had given to the police,[6] the state sought to introduce that prior statement under *Whelan.* The trial court then excused the

[4] Of course, the trial court would not have been bound to credit the witness' testimony regarding the existence of police threats or intimidation. Indeed, for the reasons stated hereinafter, I do not believe that the record of this case supports a contrary conclusion even if Thompson's testimony is credited in its entirety.

[5] Any claim that the defendants were prejudiced because the trial court unduly truncated the *Whelan* hearing must focus on the evidence that *would have been adduced* during the defendants' voir dire examination of Thompson but for the undue limitation placed on that questioning. In concluding that the trial court's failure to allow the defendants an adequate opportunity to establish that Thompson's prior inconsistent statement was unreliable, the dissent improperly focuses on the fact that Thompson's prior written statement contained information that materially assisted the state in proving its case, rather than on the harm that inured to the defendants by virtue of the limitation placed on their voir dire examination of Thompson.

[6] Thompson's statement was dated May 6, 1994, and she testified on June 16 and 17, 1994. The portion of her statement that was submitted to the jury reads as follows: "Before we left the south end [Ruffin] said to Torik [Baldwin], 'If you are going to do something, come on. If you are not going to do nothing, don't come.' I saw a large gun in a carrying bag, and underneath the bag were some smaller guns. These guns were on the floor, near the back seat.

"There was also a second car there, the one which Smash [Wooten] and Dwayne [Goethe] came up on. This car I believe is Dwayne's, because I

jury and allowed the parties to conduct a voir dire examination of Thompson regarding her prior statement. On direct examination by the state, Thompson testified that: (1) she had read the statement and made a correction to it; (2) the statement contained language indicating that it had been made voluntarily; (3) she had initialed it in several places; and (4) she had signed it. On cross-examination by the defendants, Thompson testified that: (1) she had made the written statement at the police station; (2) she had been induced to travel to the station against her free will; and (3) she had not given the statement of her own free will. Thompson also testified, however, that she had been told by the police that she was free to leave the police station. The defendants then asked Thompson, "Did [the police] tell you what would happen to you if you didn't sign the statement?" The state objected to the defendants' question, and the trial court sustained the objection. After a colloquy between the court and counsel regarding the admissibility of a prior inconsistent statement under *Whelan*, the trial court indicated that further examination of Thompson outside the presence of the jury was unnecessary, that the state was entitled to introduce Thompson's prior written statement under *Whelan*, and that the defendants were free to cross-examine Thompson in the presence of the jury regarding the circumstances surrounding her prior statement.

seen him in it before. When we left the south end, Dwayne, Smash and Marcellus [Ruffin] went in the red car. We pulled off first, and they pulled off second."

Thompson's testimony at trial differed from this statement in three respects. First, she claimed not to remember exactly what Ruffin had said, characterizing it at trial as follows: "Only thing I know he said was um—if you coming, come. If you not—is you coming. Something." Second, she claimed not to remember seeing the second car come with them. Neither defendant, however, was alleged to have been in that second car. The third, and only material, difference between Thompson's statement and her testimony at trial was that she claimed at trial not to have seen several guns in the car, but, rather, a black, soft pouch about two feet long that looked like it had a gun in it.

After the parties had discussed which portions of Thompson's prior statement were to be published to the jury, defense counsel made the following claim: "Respectfully, Judge, had I been allowed to continue, I think we would have learned that she was put into a—the police came to her home, put her into a police car, brought her to a police station, put her into a room in a detective bureau, and threatened and intimidated her. And [they] had already prepared at least some portions of this statement before her arrival there."[7] The trial court again rejected the defendants' request for the opportunity to voir dire Thompson regarding whether her prior written statement was coerced, and the pertinent portions of Thompson's statement then were admitted into evidence by the court.

Thereafter, however, the defendants were afforded a full opportunity to cross-examine Thompson, in the presence of the jury, regarding her statement and the circumstances surrounding it. Thompson's testimony, during both the voir dire examination and the examination before the jury, belies the defendants' claim that they were prejudiced because the trial court unduly truncated their voir dire examination of Thompson.

On cross-examination by the defendants in the presence of the jury, Thompson testified that she had been driven to the police department by a police officer who had represented to her that he wanted her to go to the station to discuss a matter unrelated to this case.[8] Thompson also testified that she was told by the police that, in light of certain statements that Ruffin and his accessory, Torik Baldwin, had made, she could face

---

[7] The defendants had earlier argued that further cross-examination of Thompson outside the presence of the jury would establish that the prior written statement "is not a statement by [Thompson]."

[8] According to Thompson, the officer told her that he wanted to discuss a complaint that Thompson had filed with the police department regarding a person who allegedly had been stalking her.

criminal charges due to her involvement with members of the "Nation" gang.[9]

On redirect examination by the state, Thompson indicated that she had been taken to the courthouse to speak with the state's attorney prior to giving her statement to the police, and that she previously had refused to give a written statement to the police on March 29, 1994. Thompson also testified that the police had offered to relocate her and to help her stay in school. Thompson then testified that she did not want to cooperate with the police but that she had done so to avoid being treated as a confederate of the Nation gang or being used as an alibi witness by Ruffin or by Baldwin.[10]

The essence of Thompson's testimony, therefore, was that she did not want to give the authorities a statement, but that she did so after the police, who had persuaded her to go to the police station by misrepresenting their real interest in speaking to her, warned her that the defendants might seek to use her as an alibi witness, and that she faced possible charges stemming from her

---

[9] Defense counsel had asked Thompson, "Did they say that anything would——did [the police officer] say that anything would happen to you if you did not cooperate with his investigation?" Thompson replied, "The only thing he said was that people wrote statements down that I was down with [the] Nation and all this and I could get charged with all that other stuff."

[10] Thompson testified that she cooperated "[b]ecause they told me [Ruffin] and them was saying all this stuff, writing alibis and saying all this other stuff when I went down there. . . . And they was telling me that everybody know, and that all this stuff, that you know, and they putting you down, they going to have you testify for them, and all this stuff. . . . Saying that everybody wanted me to come down here and sign these statements and stuff, and all this. I told them I didn't want no part of this." When Thompson was then asked by the state whether she had given a written statement, Thompson replied, "After they done told me all that about saying I was down with [the] Nation, saying that they were going to charge me for all that other stuff." At no time did Thompson elaborate as to what she meant by "all that other stuff." Furthermore, contrary to the claim made by the defendants, Thompson never testified that she had signed a form that already had been prepared for her by police.

involvement with the Nation gang.[11] Even if we assume, arguendo, that Thompson's testimony is true, these police practices simply do not support a claim that the statement had been extracted from her "against her . . . will" or by use of "threat[s] and intimidat[ion]." Because the investigative techniques allegedly employed by the police were entirely legitimate, it cannot reasonably be argued that her statement was the product of duress, coercion or undue pressure such that the statement's reliability might seriously be called into question.[12] The tactics used by the police to induce Thompson to provide a statement were, instead, grist for the cross-examination mill; see, e.g., *State* v. *Hopkins*, 222 Conn. 117, 125, 609 A.2d 236 (1992) ("[a]lthough these factors are relevant and proper matters for cross-examination, they go to the weight of the evidence and not its admissibility"); and the record clearly reveals that the defendants were afforded wide leeway, in the presence of the jury, in questioning Thompson regarding the circumstances surrounding the production of her statement. It bears emphasis, moreover, that Thompson herself previously had testified that she had attempted to provide the police with a truthful and accurate statement concerning the events in question. Under the circumstances, it therefore is clear that the defendants cannot prevail on their claim that the statement lacked sufficient indicia of reliability to be admitted as substantive evidence.[13]

Accordingly, I concur in the result reached in part I of the majority opinion.[14]

---

[11] I note that there is nothing in the record to suggest either that Thompson was not a potential alibi witness or that she did not have some criminal exposure as a result of her involvement with the Nation gang.

[12] Thus, the dissent's reference to the use of "the rack and the screw" bears no relevance to this case.

[13] Accordingly, I disagree with the dissent's conclusion that it is necessary that this court remand this case so that the trial court can reconsider the admissibility of Thompson's statement.

[14] The dissent also maintains that the statement provided by Ruffin's sister, Ebony Phillips, should not have been admitted under *Whelan* because she

was unable to read the statement, the statement had been given long after the events had occurred, and the statement had been composed by a police officer. Because the defendants failed to object to the admission of Phillips' statement on these grounds at trial, I agree with the majority that the defendants have failed to preserve the issue on appeal.