STATE OF CONNECTICUT *v.* ANTHONY HOPKINS
(13832)

PETERS, C. J., SHEA, CALLAHAN, COVELLO and BERDON, Js.

Argued January 15—decision released May 19, 1992

*Sue L. Wise,* with whom, on the brief, was *Diane Polan,* for the appellant (defendant).

*Frederick W. Fawcett,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, and *Robert A. Lacobelle,* assistant state's attorney, for the appellee (state).

BERDON, J. The defendant, Anthony Hopkins, was convicted by a jury and sentenced to a term of imprisonment for fifty years for felony murder in violation of

General Statutes § 53a-54c, attempted robbery in the first degree in violation of General Statutes §§ 53a-49 and 53a-134 (a) (1), and assault in the first degree in violation of General Statutes § 53a-59 (a) (1).[1] In his appeal to this court, the defendant claims that the trial court improperly: (1) admitted as substantive evidence a prior inconsistent statement of a nonparty witness; and (2) deprived him of a fair trial in its supplemental instructions to the deadlocked jury and also in its jury instructions as a whole. We affirm the judgment of the trial court.

[1] General Statutes § 53a-54c provides: "A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, sexual assault in the first degree with a firearm, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants, except that in any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (A) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (B) was not armed with a deadly weapon, or any dangerous instrument; and (C) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (D) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

General Statutes § 53a-49 provides in pertinent part: "(a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

General Statutes § 53a-134 (a) (1) provides: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime: (1) Causes serious physical injury to any person who is not a participant in the crime."

General Statutes § 53a-59 (a) (1) provides: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument."

From the evidence presented, the jury could reasonably have found the following facts. In the early morning hours of August 27, 1988, Dorothy Hopkins, a prostitute and drug addict, was soliciting on the corner of Barnum Avenue and Kossoth Street in Bridgeport. Her husband and pimp, Earl Hopkins, was nearby. Keith Kochiss approached Dorothy Hopkins in his car, which she entered. They proceeded to drive around the area. When they agreed upon a price for her services, Kochiss parked his car on Maple Street, closed the window, locked the car and unzipped his pants. As she was about to perform a sexual act, Dorothy Hopkins saw the defendant, who was her brother-in-law, approach the car with another individual. Both of the men who approached the car were black. The defendant demanded that Kochiss turn over his money. When Kochiss attempted to reach for the ignition key, the defendant fatally shot him in the head through the closed window. The bullet went through Kochiss' head and entered Dorothy Hopkins' body.

The defendant then put his hand through the shattered window and turned the ignition key. The car lunged forward and crashed into a tree. As Dorothy Hopkins crawled out of the car, Wanda Carter came running by. Dorothy Hopkins asked Carter to summon her husband from the park. When the police arrived at the scene, they found Dorothy Hopkins staggering about the street. The window on the driver's side of Kochiss' automobile was shattered and the interior was covered with blood. Kochiss was slumped over in the driver's seat. After arriving at the hospital, Dorothy Hopkins was briefly interviewed by the police and said only that she had been robbed by two black males. Subsequently, Dorothy Hopkins gave the police a written statement implicating the defendant as the person who had shot Kochiss. She also testified to that effect at the defendant's probable cause hearing.

## I

The defendant's first claim is that the trial court improperly admitted for substantive purposes the written statement that Dorothy Hopkins had given to the police in which she identified the defendant as the person who had approached the car and had fired the shot that killed Kochiss and wounded her. At trial, Dorothy Hopkins testified that she had been with Kochiss in his car on Maple Street and that after they had agreed upon a price for her services, Kochiss had unzipped his pants. As this was happening, she had seen two men, *whom she could not identify,* approach the car. One of the men had fired a shot through the window and Kochiss had fallen onto her lap. The unknown assailant had reached into the car, had started the engine and had put the car in gear, causing it to roll into a fence. She also testified that she had pleaded with the man not to harm her, not realizing that she had been shot.

Contrary to this testimony, on September 8, 1988, twelve days after the incident, Dorothy Hopkins gave a statement at the police station that implicated the defendant. In the written statement, which was signed and witnessed, Dorothy Hopkins stated, in part, that the defendant "came up to the window on the driver's side of the car. [The defendant] had a gun in his hand, and he tapped on the window and he said, 'Mother Fucker, give me your damn money.' My date sort of ducked his head and I saw his hand going toward the ignition, I believe that he was going to try to start the car and Anthony may have thought that my date was going to reach for something and that was when he shot my date. Anthony shot straight through the window. After the shot, my [date's] head fell on my lap."

The trial court, after an extensive voir dire and over the objection of the defendant, admitted into evidence this out-of-court statement for both impeachment and substantive purposes.[2] Thereafter, the defense attempted to introduce into evidence an affidavit that Dorothy Hopkins had executed shortly after she had given the statement to the police, in which she had recanted her statement that the defendant had shot Kochiss. The trial court sustained the state's objection to the introduction of the affidavit. The defendant *did not* have the affidavit marked for identification purposes and *does not* now claim in this appeal that the court's ruling was improper.

In *State* v. *Whelan,* 200 Conn. 743, 748–49, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), we abandoned the traditional view "that a prior inconsistent statement of a nonparty witness is inadmissible hearsay if offered to prove the truth

---

[2] The trial court clearly allowed the statement to be introduced for substantive purposes as well as for impeachment. At the time the court admitted the statement into evidence, it instructed the jury as follows: "Ladies and gentlemen of the jury, the court overrules the objection to the admissibility of this statement. The statement becomes evidence in the case for your consideration. . . . The law now is that you may consider it as evidence of the substantive offenses beyond impeachment as if it were testimony given here. You will examine [the] prior statement, her testimony here and any other testimony that you will hear concerning statements made as you've already heard in the hearing in probable cause. . . . You understand the statement is before you for all purposes. It'll be for you to determine what you believe to be the truth. The present, prior or neither. That's for you to decide." The defendant took a timely and appropriate exception to this ruling. The state argues on appeal that because the defendant failed to take an exception to the court's formal charge at the end of the evidence wherein the trial court again instructed the jury that it could use the statement for substantive purposes, the defendant is now precluded from appellate review. There was no need to take an exception to the charge in order to preserve the issue of whether it was improper for the trial court to admit the statement into evidence in the first instance. See Practice Book § 4185; *State* v. *Person,* 20 Conn. App. 115, 129–30, 564 A.2d 626 (1989), aff'd, 215 Conn. 653, 577 A.2d 1036 (1990) cert. denied, 498 U.S. 1048, 111 S. Ct. 756, 112 L. Ed. 2d 775 (1991).

of the matters asserted therein and, therefore, is admissible only for impeachment purposes." In *Whelan,* we adopted the rule allowing the substantive use of a prior inconsistent statement if: (1) the statement is in writing;[3] (2) it is signed by the declarant; (3) the declarant has personal knowledge of the facts set forth in the statement; and (4) the declarant testifies at trial and is subject to cross-examination. Id., 753. In *State* v. *Almeda,* 211 Conn. 441, 452, 560 A.2d 389 (1989), we made it clear that the *Whelan* exception applied equally to unsworn statements.

The defendant correctly states that the rationale underlying the *Whelan* exception to the hearsay rule is that its requirements assure reasonable reliability. He argues, however, that the particular circumstances surrounding Dorothy Hopkins' statement undercut its reliability and, therefore, it should have been excluded. We disagree with the defendant.

First, the defendant argues that because Dorothy Hopkins testified at trial that she was unable to identify the defendant as the perpetrator and because there was no other evidence presented to connect the defendant to the crime, her statement should have been excluded. Commentators have pointed out that "the court should require some corroborative evidence and not permit a conviction to be based solely on an out-of-court inconsistent statement [of a nonparty witness]. See *State* v. *DeFreitas,* 179 Conn. 431, 426 A.2d 799 (1980) (declaration against penal interest); see also *Commonwealth* v. *Daye,* [393 Mass. 55, 469 N.E.2d 483 (1984)]." C. Tait & J. LaPlante, Connecticut Evidence

---

[3] Although we are not presented with such a situation here, we treat prior tape recorded statements as prior written statements. *State* v. *Holloway,* 209 Conn. 636, 649, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989); *State* v. *Whelan,* 200 Conn. 743, 754 n.9, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).

(2d Ed. 1991 Sup.) § 11.24.1, p. 122. Lack of contemporaneous cross-examination and confrontation are the major reliability concerns of such hearsay statements. The drafters of the federal rule had similar concerns because, when they took a position between the traditional rule of exclusion and the modern rule of inclusion, they added a further requirement that the statement be "given under oath subject to the penalty of perjury at a trial, hearing or other proceeding, or in a deposition . . . ." Fed. R. Evid. 801 (d) (1).

Nevertheless, this is not a case in which the only evidence of guilt was the uncorroborated and unsworn out-of-court statement of Dorothy Hopkins. In addition to Dorothy Hopkins' statement to the police, all her sworn testimony from the probable cause hearing was admitted into evidence at trial *without objection* on the part of the defendant. The testimony at the probable cause hearing was subject to contemporaneous cross-examination by the defendant. Although Dorothy Hopkins vacillated during cross-examination between identifying the defendant as the perpetrator and stating only that the assailant had been one of two black males whom she could not identify, on direct examination, she clearly implicated the defendant under oath as the person who had shot Kochiss.[4]

---

[4] At the probable cause hearing, Dorothy Hopkins described the events on the night of the shooting as follows:

"Q. And when they got near the car, were you able to recognize those persons?

"A. Yes. Yes, I did.

"Q. And who were those two persons?

"A. Anthony Hopkins and Raymond Jeffries. . . .

"Q. Now, what did they do? Did they come to the car or what did they do?

"A. Let me see. Let me see. I believe Raymond stayed in the back rear of the—on the corner. . . .

"Q. All right. What happened next?

"A. Let me see. Oh! Wait a minute. Anthony came up to the car.

"Q. Anthony came up to the car?

Second, the defendant argues that when Dorothy Hopkins gave her statement, the attendant circumstances "undercut any assumption of reliability that might otherwise inure to her written statement." Specifically, the statement was taken only after Dorothy Hopkins was told that the defendant was a suspect because he had been found in the area, and that she and her husband, Earl Hopkins, who had been one block away at the time of the incident, were also suspects. Additionally, Dorothy Hopkins was reminded of the criminal charges pending against her for another incident. Finally, she gave the statement only twelve days after the incident in which she had been seriously injured and while under the influence of Percocet, a prescription drug that made her feel dazed, disoriented and sluggish, similar to the way she said that illegal drugs made her feel. Although these factors are relevant and proper matters for cross-examination, they go to the weight of the evidence and not its admissibility. Moreover, this is not a situation in which the statement was given in response to leading questions, "which are laden with facts to which the witness has merely answered with a 'yes' or 'no.'" C. Tait & J. LaPlante, supra, § 11.24.1, p. 122; *Commonwealth* v. *Daye,* supra. Rather, the statement was given in a setting requiring the witness to respond with narrative answers.

"A. Uh-huh.
"Q. What side of the car?
"A. On the driver's side. . . .
"Q. What did he say?
"A. He had asked—I don't know if I can repeat the words.
"Q. Repeat the words.
"A. He asked—Mother fucker, give me your money. . . .
"Q. . . . Could you see Anthony there?
"A. Well, yes, I seen him.
"Q. Did he have anything in his hand?
"A. Yes, he had a gun. . . .
"A. Anthony reached his arm through there and turned the ignition on and pulled the lever of the car."

Recently, we held in regard to the *Whelan* exception "that a prior inconsistent statement had to be given under circumstances ensuring its reliability and trustworthiness in order to be admissible [for substantive purposes]." *State* v. *Grant,* 221 Conn. 93, 100, 602 A.2d 581 (1992). It is the trial court's responsibility to weigh the reliability of each statement on a case-by-case basis. Id., 100–101. Although the *Whelan* rule may require some honing, this is not the case in which to do it. The witness implicated the defendant at the probable cause hearing while under an oath to testify truthfully and while she was subject to contemporaneous cross-examination by the defendant's counsel. No objection was made to the introduction of the testimony from the probable cause hearing. Accordingly, we conclude that the out-of-court statement Dorothy Hopkins had given to the police had sufficient indicia of reliability and was properly admitted for substantive purposes.

## II

The defendant next claims that the trial court incorrectly instructed the jury in two respects after the jury reported that it was deadlocked "six to six" on the third day of deliberations. First, the defendant argues that the supplemental "Chip Smith" instruction; *State* v. *Smith,* 49 Conn. 376, 386 (1881); prejudiced the defendant and coerced the jury into agreeing to a verdict. Second, the defendant claims that the trial court incorrectly instructed the jury in its second supplemental charge. The defendant also claims that the trial court's charge to the jury, as a whole, violated his right to a fair trial. We will treat each claim seriatim.

## A

After receiving a note from the jury indicating a deadlock, the court gave a "Chip Smith" instruction,

to which the defendant did not object.[5] After the jury returned to the deliberating room, counsel for the defendant sought an additional instruction stressing to the jurors that they were not compelled to agree; the trial court acceded to this request.

The jury, thereafter, resumed deliberations for another two hours and again reported that it was deadlocked. After the trial court denied the defendant's motion for mistrial, the court gave the following supplemental instruction to the jury (first supplemental charge):[6] "I have your note. I've reported to counsel that the note . . . simply . . . refers to deadlock. The case is a serious case. *A life has been taken in the commission of crime in this society* and the time spent

---

[5] In discussing the "Chip Smith" charge, commentators have noted the criticism aimed at the *Allen* charge, its federal analogue: "ABA Standards for Criminal Justice, Trial By Jury § 15-4.4 (2d Ed. 1978) strongly criticizes the federal analogue to the Chip Smith charge, *Allen* v. *United States,* 164 U.S. 492, 17 S. Ct. 154, 41 L. Ed. 528 (1896), and concludes: '[T]he Allen charge should not be used. It is appropriate, however, for a court to give or repeat to the jury an instruction on its responsibilities . . . when the jury has indicated its inability to reach an agreement or has deliberated for some time without reaching an agreement.' (Id. at 15.143.)" D. Borden & L. Orland, Connecticut Criminal Jury Instructions (1986) § 4.8, pp. 137–38, reference note A.

[6] The transcript of the trial court's entire first supplemental charge to the jury provides: "I have your note. I've reported to counsel that the note says simply, refers to deadlock. The case is a serious case. A life has been taken in the commission of crime in this society and the time spent on the deliberations so far, in the judgment of the court, is insufficient for anyone to report that they are at deadlock they cannot resolve. I believe you should spend more time on the subject. I believe that you should take into account, my instructions in regard to the listening to one another's positions, and recognizing whether or not the basis upon which you have reached [a] conclusion [is] reasonable. And throughout the proceedings, the key word has been reasonable. What do you reasonably believe from the witnesses that have been presented before you. I'm going to ask you to continue and we will stay until I feel that there has been an adequate period of time devoted to the deliberation in the many issues that have been created by the evidence in this case. I don't believe we have met that point at this time. So I'm going to ask you to resume and to continue your deliberations in an effort to resolve the case. You may step out and continue."

on the deliberations so far, in the judgment of the court, is insufficient for anyone to report that they are at deadlock they cannot resolve. I believe you should spend more time on the subject." (Emphasis added.) The defendant took an exception to the first supplemental charge on the ground that the instruction was not balanced because, while the court mentioned that the jury should consider that a death had occurred, it did not mention to the jury that it should also consider "the freedom of the individual who is on trial." We conclude that any disproportionality in the first supplemental charge was corrected when the jury was returned to the courtroom and the trial court gave a further instruction (second supplemental charge)[7] that it had not intended to attribute the death to the defendant and that the jurors were to consider his comments "even handed."

## B

The defendant also argues, for the first time on appeal, that the court, in its second supplemental charge, improperly told the jury to convict the defend-

---

[7] The following is the text of this entire second supplemental charge, to which the defendant took no exception. "I've already pointed out to you the fact that this is a serious matter. You all recognize that from the time that you have spent here in regard to it. And I emphasize that by pointing out to you that the fact that this is a loss of life and a death occurred and I don't mean in any way that that's attributable in my judgment, because it's not my judgment to the accused. What I'm saying to you is the deadlock leaves the matter up in the air. And when I say that the fairness of the quality and the fair treatment of that subject, that if your deliberations result in the determination that it's fair to the state and fair to the accused. I mean this man is charged with this killing. If he did so and you are satisfied that he did and can arrive at that conclusion, you'll report that verdict. If he did not, it tells us and him that he did not do it. But a deadlock is between the two. And requires a retrial. So I'm asking you to consider my comments even handed. I'm not suggesting any verdict to you. I wouldn't dream of doing that. But I would ask you to seek out your one and other's counsel and see if you can resolve this case by continued deliberation. Even handedly, considering of course, the requirements of law, the burdens of the state and the accused's position. Okay. Please try and do that."

ant if it was "satisfied that he did [kill]."[8] We agree with the defendant that this statement was improper because it diluted the state's obligation to prove the defendant's guilt beyond a reasonable doubt. *State* v. *DelVecchio,* 191 Conn. 412, 419–20, 464 A.2d 813 (1983). Despite the improper statement, however, the defendant cannot prevail in this case because the state has clearly demonstrated that under the *Golding-Evans*[9] rule; *State* v. *Golding,* 213 Conn. 233, 239, 567 A.2d 823 (1989); *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973); the constitutional violation was harmless beyond a reasonable doubt in light of the numerous times that the trial court correctly stated the applicable law. "The whole charge must be considered from the standpoint of its effect on the jury in guiding [it] to the proper verdict . . . and not critically dissected in a microscopic search for possible error." (Citations omitted; internal quotation marks omitted.) *State* v. *Anderson,* 212 Conn. 31, 37, 561 A.2d 897 (1989). In its original instruction to the jury, the court charged on the defendant's presumption of innocence at least four times. On at least six separate occasions, the trial court generally charged on the state's burden of proof. Additionally, the jury was specifically instructed nine times on the state's burden of proof in regard to the elements of the charged crimes. Just prior to its "Chip Smith" charge, the trial court, in response to the jury's request, again instructed the jury on the state's burden of proof. See *United States* v. *Angiulo,* 485 F.2d

---

[8] See footnote 7, supra.

[9] "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." *State* v. *Golding,* 213 Conn. 233, 239, 567 A.2d 823 (1989).

37, 39 (1st Cir. 1973) ("[T]he ['Chip Smith'] charge might move some jurors to forget the prosecution's heavy burden of proof and the defendant's fundamental presumption of innocence. . . . [W]e strongly advise trial courts to balance a supplemental charge so that . . . jurors would be reminded of the burden of proof.").

## C

The defendant finally claims that the jury charge as a whole deprived him of a fair trial. "To determine whether an error in the charge to the jury exists, we review the entire charge to determine if, 'taken as a whole, the charge adequately guided the jury to a correct verdict.' " *State* v. *Grullon,* 212 Conn. 195, 204, 562 A.2d 481 (1989), quoting *State* v. *Fleming,* 198 Conn. 255, 268–69, 502 A.2d 886, cert. denied, 475 U.S. 1143, 106 S. Ct. 1797, 90 L. Ed. 2d 342 (1986).

The defendant's claim is barren of any specifics except that the trial court had improperly commented on the evidence during its instruction to the jury. In this regard, it must be remembered that a trial court has broad discretion to comment on the evidence. *State* v. *James,* 211 Conn. 555, 571, 560 A.2d 426 (1989). Furthermore, the defendant took no exception to the charge in this respect.[10] The defendant has failed to demonstrate how this unpreserved claim satisfies the *Golding-Evans* requirements. Accordingly, the claim is without merit.

The judgment of the trial court is affirmed.

In this opinion the other justices concurred.

---

[10] Exceptions to the original charge were taken in two instances, but the court reinstructed the jury correcting the claims of error, to which no exception was taken.