STATE OF CONNECTICUT *v.* ROBERT HERSEY
(AC 22779)

Foti, Pellegrino and Dranginis, Js.

Argued April 29—officially released July 22, 2003

*Donald D. Dakers*, special public defender, for the appellant (defendant).

*Julia K. Conlin*, deputy assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Lisa Herskowitz*, assistant state's attorney, for the appellee (state).

*Opinion*

FOTI, J. The defendant, Robert Hersey, appeals from the judgment of conviction, rendered following a jury trial, of disorderly conduct in violation of General Statutes § 53a-182, assault in the third degree in violation of General Statutes § 53a-61 (a) (1), criminal violation of a protective order in violation of General Statutes § 53a-223, burglary in the third degree in violation of General Statutes § 53a-103 and breach of the peace in violation of General Statutes (Rev. to 2001) § 53a-181.[1] On appeal, the defendant claims that the trial court (1) improperly admitted into evidence certain of the victim's prior inconsistent statements and (2) delivered incorrect jury instructions concerning inferences that the jury properly could draw from the evidence, the charge of burglary in the third degree and the charge of violation of a protective order. We affirm the judgment of the trial court.

From the evidence adduced at trial, the jury reasonably could have found the following facts. The female

---

[1] The state also charged the defendant in a part B information with having committed certain of the criminal offenses with which he stood charged while released on bond in violation of General Statutes § 53a-40b. The defendant pleaded guilty to that charge under the *Alford* doctrine. See *North Carolina* v. *Alford*, 400 U.S. 25, 38, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).

victim and the defendant shared a home in Manchester where, at or around 6:30 p.m. on April 26, 2001, they engaged in a domestic dispute. The victim was speaking to a relative on the telephone when the defendant started yelling insults at her. The defendant grabbed the telephone from the victim's hands and hung it up. Motivated by fear for her safety as the defendant continued to yell at her, the victim attempted to summon police assistance. While she used the telephone to call the police, the defendant became even more agitated. He again grabbed the telephone from the victim's hands and hung it up. The defendant called the victim a "stupid idiot" and told her that she would not "get away with this again." The defendant then threw a crumpled bag at the victim and raised his hand in a threatening manner, as if he were going to strike the victim. The defendant physically had abused the victim prior to that incident, and the victim backed away from him in response to his threatening behavior. The defendant, however, ran out the front door of the residence, only to be apprehended by police, who arrested him on a charge of disorderly conduct shortly thereafter. The defendant was released on bond and arraigned the following morning, April 27, 2001. Before 1 p.m. on April 27, 2001, the court issued a protective order, thereby ordering the defendant to refrain from, inter alia, having contact "of any kind with the victim" and from "entering the family dwelling or the dwelling occupied by the victim."

At or around 4 p.m., on April 27, 2001, the defendant went to the victim's house. The defendant encountered the victim, who had been in the bathroom. When the victim opened the bathroom door, the defendant grabbed her by the neck and violently pushed her to the floor. The defendant's actions caused the victim to suffer a cut lip and a nose bleed. The defendant yelled

at the victim, telling her that she "really screwed [his] life up." Afterward, the defendant ran out of the house.

Police later apprehended and arrested the defendant and, following a jury trial, the court sentenced him to a term of imprisonment of fifteen years and three months, suspended after five years and three months, and five years of probation. Additional facts and procedural history relevant to the defendant's claims will be set forth as necessary.

I

The defendant first claims that the court improperly admitted into evidence certain of the victim's statements and permitted the jury to use them substantively under *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). We disagree.

At trial, the victim testified that she loved the defendant, her boyfriend of four years, and wanted to be with him. In regard to the events underlying the defendant's conviction, the victim testified that on April 26, 2001, she and the defendant had been arguing. She testified that he threw a crumpled bag at her and, when she tried to call the police, he took the telephone from her hands and hung it up. She also testified that the defendant was "raising his arms" while he yelled at her and that she was merely a "little" frightened of him. She testified, however, that she did not believe that he was going to do anything to her. With regard to the next day's events, the victim testified that the defendant never even came to her home on April 27, 2001, and that she cut her lip when she fell down that day.

During direct examination by the state, the prosecutor showed the victim two written statements that she gave to Richard Grimaldi, a Manchester police officer. The victim testified that Grimaldi took the first state-

ment in her home on April 26, 2001.[2] The victim also testified that the statement contained her signature, but that she did not have her glasses on when she signed it and had not read it when she signed it. The victim further testified that the next day, she had in fact sought a protective order to prevent the defendant from returning to her home.

When the prosecutor showed the victim her statement of April 27, 2001, she testified that she did not remember giving that statement to the police.[3] She then testified that she recalled signing the statement, but that she had been "drinking" during that day.

[2] The statement, signed by the victim, states:

"I give the following statement to officer Grimaldi on my own free will without threat or promise.

"On 04-26-01 at approximately 1826 hours I was trying to call my Aunt. When [the defendant] heard this he became agitated and started yelling at me. He kept yelling [that] I was stupid, ignorant and [that] my hair looked stupid.

"[The defendant] became so agitated he grabbed the phone out of my hands and hung it up. [The defendant] then continued yelling at me to the point I became afraid for my safety and called the police.

"When [the defendant] heard me on the phone with the police he again grabbed the phone out of my hands and hung it up. He then yelled at me 'You stupid idiot, your not gonna get away with this again.'

"[The defendant] then threw a crumpled up bag at me and then raised his arm up like he was gonna hit me.

"Due to [the defendant] abusing me in the past I became very afraid and started backing away from him.

"[The defendant] then pulled on his sneakers and ran out the front door."

[3] The statement, signed by the victim, states in relevant part:

"I give the following statement to officer Grimaldi on my own free will without threat or promise.

"On 04-27-01 at 1600 hours I was in my house . . . . I was in my bathroom and I heard footsteps coming in the house. I opened the bathroom door to see who came in and [the defendant] was standing in front of the door.

"[The defendant] reached into the bathroom, grabbed me by the neck and pushed me to the floor where I struck my lip and nose on the baseboard. This caused a cut to my lip and my nose started bleeding.

"[The defendant] started yelling 'What the fuck did you do now, you really screwed my life up.' I then said 'Good you deserved it.' [The defendant] then ran out the back door of the house."

Following that testimony, the prosecutor sought to introduce into evidence both of the victim's statements. The defendant objected on the ground that the statements were hearsay. The state argued that the statements were admissible as prior inconsistent statements under *Whelan*. Before ruling on the admissibility of the statements, the court permitted the defendant to voir dire the victim concerning the statements. The victim reiterated that she had not read the April 26, 2001 statement and testified that within twenty-four hours of giving that statement, she was admitted to a hospital under an emergency psychiatric commitment. She testified that at the time she made the statement, she was "pretty upset and pretty confused," and that she signed the papers when she "shouldn't have." During further examination by the state, the victim testified that the statement was reliable, that she did not believe that the April 26, 2001 statement was in any way inaccurate and that the facts alleged therein were likely what she told Grimaldi.

With regard to the April 27, 2001 statement, the victim testified on voir dire examination that she had consumed three or four eight ounce alcoholic drinks beginning around midday on April 27, 2001. The victim further testified that on April 27, she was under the influence of a myriad of psychiatric and other medications. The victim recalled that because of an impaired physical condition following hip surgery, she tripped and fell over some carpeting in her home that day. According to the victim, someone from an assistance program to which she belongs came to her home and asked about her cut lip. The victim testified that she told the person that the defendant had caused the cut lip, left the house with the person and did not remember meeting with Grimaldi later that day. After that examination of the victim, the court admitted both statements into evidence under *Whelan*. The defendant argues now, as he

did at trial, that the statements are inadmissible under *Whelan* because they lack sufficient indicia of reliability.

We first set forth our standard of review. "The admissibility of evidence, including the admissibility of a prior inconsistent statement pursuant to *Whelan*, is a matter within the . . . discretion of the trial court. . . . [T]he trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done. . . . On review by this court, therefore, every reasonable presumption should be given in favor of the trial court's ruling." (Citations omitted; internal quotation marks omitted.) *State* v. *Corbin*, 260 Conn. 730, 736–37, 799 A.2d 1056 (2002).

The *Whelan* rule is an exception to the rule against hearsay. It permits a nonparty witness' prior inconsistent statements to be used for substantive purposes, that is, to prove the truth of the matters asserted therein, provided that the following conditions exist: (1) the statement must be in writing, (2) the statement must be signed by the declarant, (3) the declarant must possess personal knowledge of the facts contained therein, and (4) the declarant must testify at trial and be subject to cross-examination. *State* v. *Whelan*, supra, 200 Conn. 753; see also Conn. Code Evid. § 8-5 (1). The *Whelan* rule is meant to assure a reasonable degree of reliability in a proffered statement; to be admissible, "a prior inconsistent statement must have been given under circumstances ensuring its reliability and trustworthiness." *State* v. *Davis*, 32 Conn. App. 21, 38, 628 A.2d 11 (1993). The admission of prior statements under the rule affords the trier of fact an opportunity to gauge a witness' present testimony after such witness is confronted with a prior inconsistent statement. "[G]iven the opportunity for meaningful cross-examination of such a witness, the witness will be forced either to explain the discrepancies between the earlier state-

ments and his present testimony, or to deny that the earlier statement was made at all. . . . After this type of examination, the jury can draw whatever conclusions concerning the witness' testimony that it deems to be appropriate." (Citation omitted; internal quotation marks omitted.) *State* v. *Vasquez*, 68 Conn. App. 194, 200–201, 792 A.2d 856 (2002).

The defendant correctly points out that there are rare cases in which a prior inconsistent statement that satisfies the *Whelan* requirements may have been made under circumstances that undermine its reliability. In such cases, the court acts as a gatekeeper and properly excludes such statements that are so untrustworthy that their admission would "subvert the fairness of the fact-finding process." (Internal quotation marks omitted.) *State* v. *Watkins*, 72 Conn. App. 804, 813, 806 A.2d 1072 (2002), cert. denied, 263 Conn. 923, 823 A.2d 1216 (2003). The defendant argues that such a situation existed here.

The defendant does not argue that the written statements did not satisfy *Whelan*'s requirements. Instead, he argues that the "April 27 statement of [the victim] to the police was made under circumstances that were so unreliable" that the court abused its discretion in admitting the statement into evidence.[4] The defendant points out that the victim testified that on April 27, 2001, when she gave her statement, she was under the influence of alcohol and various medications, and that she did not recall having made the statement to Grimaldi. Further, the defendant points out that it is likewise undisputed that "hours after having made the statement, [the victim] was placed in a psychiatric unit of the hospital for a period of five days."

---

[4] Despite doing so at trial, the defendant, in his brief, does not address the admissibility of the victim's April 26, 2001 statement to Grimaldi. He challenges therein only the admissibility of the April 27 statement, and we, likewise, will circumscribe our analysis and address only that issue.

The court did not find the victim's account of the circumstances under which she made the statements to Grimaldi to be persuasive. The court made several observations and findings in admitting the April 27, 2001 statement. As a whole, the court found the victim's testimony that she did not remember what took place concerning her statement "to be incredible and unbelievable." In support of that finding, the court observed that the victim testified that she had "cooperated with the defendant in the preparation of the defense" and, in so doing, had met with the defendant's attorney several times. The court also observed that the victim expressed her love for the defendant and her apparent desire to be reconciled with him. The court further observed that the victim admitted that her April 26, 2001 statement, from which she originally had distanced herself, was reliable and that during her testimony, she did not cooperate with the prosecutor.

Additionally, the court stated that the April 27 statement was made on the day that the events recorded therein took place and that there was no dispute that the victim had signed the statement or that she did so voluntarily. The court also made note of the fact that a notation regarding the misdemeanor penalty for signing a false statement appeared at the bottom of the statement form that, the defendant concedes, the victim signed. The court stated that "[t]he fact that the witness was drinking and had consumed many medications, according to her testimony, in the court's opinion goes to cross-examination and the weight to be accorded to the statement by the jury, but not to the admissibility of the statement."

Although the defendant raised the issue of the statement's reliability, the court's resolution of that issue rested on factual findings related to the witness' credibility. This court is bound by the trial court's assessment of a witness' credibility. See *State* v. *McDougal*, 241

Conn. 502, 510, 699 A.2d 872 (1997); *State* v. *Stevenson*, 53 Conn. App. 551, 560, 733 A.2d 253, cert. denied, 250 Conn. 917, 734 A.2d 990 (1999). Further, the court's well reasoned analysis of the issue reflects a sound exercise of its discretion. The challenged statement, which contained a narrative version of the disputed event, satisfied all of *Whelan*'s requirements. Our Supreme Court has observed that "because the requirements that we established in *Whelan* provide a significant assurance of reliability, it will be the highly unusual case in which a statement that meets the *Whelan* requirements nevertheless must be kept from the jury." *State* v. *Mukhtaar*, 253 Conn. 280, 307, 750 A.2d 1059 (2000). This is not such a case. Here, the court did not find that any "coercive or extreme" circumstances existed when the witness made the prior statement. See *State* v. *Watkins*, supra, 72 Conn. App. 813. There is no indication that the statement was not, despite its appearance, that of the witness.

The witness' claims of being under the influence of medications or the like are relevant for the jury to consider, but they "go to the weight of the evidence and not to its admissibility."[5] *State* v. *Hopkins*, 222 Conn. 117, 125–26, 609 A.2d 236 (1992) (court properly admits statement into evidence under *Whelan* despite witness' testimony that she was disoriented, dazed, sluggish when she made statement); see also *State* v. *Trotter*, 69 Conn. App. 1, 12–14, 793 A.2d 1172 (court properly admits into evidence statement under *Whelan* despite evidence that declarant had used heroin on day of event related therein and evidence that victim was under influence of medications), cert. denied, 260 Conn. 932, 799 A.2d 297 (2002).

---

[5] The jury had before it additional evidence relevant to the issue in the form of Grimaldi's testimony regarding his observations of the victim when she made her statements and the circumstances under which he recorded her statements.

For those reasons, we conclude that the court exercised its discretion properly in admitting the victim's prior inconsistent statement.

## II

The defendant next claims that the court improperly instructed the jury with regard to (1) burglary in the third degree, (2) violation of a protective order and (3) inferences that it could draw from the evidence. We disagree.

The defendant did not object to the court's instructions at trial, nor did his written request to charge concern the instructions he now challenges. He seeks review of those unpreserved claims under the doctrine set forth in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) Id. "The first two *Golding* requirements involve whether the claim is reviewable, and the second two involve whether there was constitutional error requiring a new trial. . . . This court may dispose of the claim on any one of the conditions that the defendant does not meet." (Internal quotation marks omitted.) *State* v. *Jones*, 65 Conn. App. 649, 653, 783 A.2d 511 (2001).

We will review the defendant's claims of instructional error because the record affords us an adequate basis on which to do so, and each of the claimed errors is

of constitutional magnitude.[6] Nevertheless, the defendant's claims fail under *Golding*'s third prong because the defendant fails to demonstrate that a constitutional violation clearly existed and that it clearly deprived him of a fair trial.

We begin our analysis by setting forth the applicable standard of review. "[I]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury." (Internal quotation marks omitted.) *State* v. *Burton*, 258 Conn. 153, 161, 778 A.2d 955 (2001). As we undertake the inquiry, we note that "the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding them to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge." (Internal quotation marks omitted.) *State* v. *Whipper*, 258 Conn. 229, 291, 780 A.2d 53 (2001). Stated otherwise, "[t]he test to be applied . . . is whether the charge, considered as a whole, pre-

---

[6] Two of the three instructional errors raised on appeal challenge instructions as to the essential elements of the crimes charged. "Not every improper jury charge . . . results in constitutional error. . . . It is, however, well settled that claims of instructional error as to the essential elements of a crime are constitutional in nature. Claims in this category implicate the possibility of a due process violation affecting the fairness of the trial." (Internal quotation marks omitted.) *State* v. *Westberry*, 68 Conn. App. 622, 635 n.9, 792 A.2d 154, cert. denied, 260 Conn. 923, 797 A.2d 519 (2002).

The third claimed instructional error concerns the court's instruction on inferences that the jury reasonably could draw from the evidence. Because the defendant argues that this instruction essentially diluted the state's burden of proof, the claim relates to his fundamental right to have the state prove the charges against him beyond a reasonable doubt and is of constitutional magnitude. See *State* v. *Whitford*, 260 Conn. 610, 644, 799 A.2d 1034 (2002); *State* v. *Henry*, 72 Conn. App. 640, 668, 805 A.2d 823, cert. denied, 262 Conn. 917, 811 A.2d 1293 (2002).

sents the case to the jury so that no injustice will result." (Internal quotation marks omitted.) Id., 296. We will now address each of the defendant's claims in turn.

A

As part of its instruction concerning burglary in the third degree, the court instructed the jury as follows:

"For you to find the defendant guilty of this charge, the state must prove the following elements beyond a reasonable doubt. Number one, that the defendant knowingly and unlawfully entered the premises. Number two, that the premises constituted a building. Three, that the unlawful entry was effected or occurred with the defendant's intent to commit the crime of assault in the third degree in that building. Burglary is an intrusionary offense, and the intrusion must be into a building.

"Now, the first element the state must prove is that the premises entered was a building. As defined by our statutes, a building is a structure that may be entered and used as a dwelling or for business or for other purposes involving occupancy by people. The second element that the state must prove is that the defendant unlawfully entered such building. A person enters unlawfully in or upon premises when, at the time of such entry, the defendant was not licensed or privileged to do so. *In this regard, I charge you that pursuant to the protective order issued on April 27, 2001, on or after 1 p.m. on April 27, 2001, the defendant was not licensed or privileged to enter [the victim's residence] unless accompanied by a Manchester police officer. Thus, I charge you that any entry of [the victim's residence] by the defendant after 1 p.m. on April 27, 2001, was unlawful.* To enter, as used herein, the defendant need not necessarily place his entire body inside the premises. Inserting any part of his body within the premises is sufficient to constitute an entry. It does not

matter how a defendant may actually have entered. If he did so without license, he has entered unlawfully. The final element that the state must prove is that the unlawful entry was effected or occurred with the defendant's intent to commit the crime of assault in the third degree in that building. And the definition of intent in this charge, this statute, is the same as the definition of intent that I've told you in the previous charge of assault in the third degree. So, I won't repeat that for you, but it's in writing in the written portion of the charge which you will have with you.

"Even if the defendant never actually committed an assault in the third degree in the premises, if the evidence establishes beyond a reasonable doubt that he entered with such intention, this is sufficient to prove that the defendant entered unlawfully with the intent to commit a crime therein. And you'll recall from my earlier instruction on the first count that the elements of assault in the third degree are that the defendant intended to cause physical injury to another and that the defendant caused such physical injury to the intended victim. If you find that the state has proven beyond a reasonable doubt each of the elements of the crime of burglary in the third degree, then you shall find the defendant guilty. On the other hand, if you find that the state has failed to prove beyond a reasonable doubt any one of the elements, you shall then find the defendant not guilty." (Emphasis added.)

The defendant argues that by instructing the jury that any entry by him into the victim's residence after 1 p.m. on April 27, 2001, was unlawful, the court "substituted [its] finding on an essential element of the crime of burglary in the third degree for that of the jury's and violated [his] due process right to have issues of fact decided by a jury." The defendant characterizes that aspect of the court's instruction as "tantamount to a

directed verdict of guilty of burglary in the third degree and cannot be viewed as harmless error."

There can be no dispute that the defendant had a due process right to have issues of fact decided by the jury. See *State* v. *Hines*, 187 Conn. 199, 210, 445 A.2d 314 (1982) ("'[i]t must always be borne in mind that litigants have a constitutional right to have issues of fact decided by the jury and not by the court'"). "Whether an entry on premises is 'unlawful' within the meaning of General Statutes § 53a-100 (b) is a question of fact for the jury. The jury must, however, be fully and properly instructed on the applicable rules of law governing that question. The trial court is obligated, in discharging its function of instructing the jury on the law, to explain those rules of law which are applicable to the facts of the particular case." *State* v. *Grant*, 6 Conn. App. 24, 31, 502 A.2d 945 (1986).

Here, the court removed the issue of the legality of the defendant's entry into the victim's residence from the jury's consideration, leaving for the jury the issues of whether the defendant (1) entered the victim's residence and (2) possessed the requisite mental state required for the commission of the crime of burglary in the third degree. We conclude that the court properly tailored its instruction to reflect the facts and issues actually before the jury.

The record reflects, as we will discuss, that the defendant made an implicit waiver regarding his right to have the jury decide whether a valid protective order precluded him from entering the victim's residence after 1 p.m. on April 27, 2001. Accordingly, we also conclude that the defendant implicitly waived his right to challenge the court's charge insofar as it instructed the jury that pursuant to the protective order, he was not licensed or privileged to enter the victim's residence at

the time of the alleged incident during the afternoon hours of April 27, 2001.

Our resolution of the issue is guided by this court's analysis in *State* v. *Arluk*, 75 Conn. App. 181, 191–93, 815 A.2d 694 (2003). In *Arluk*, the defendant claimed on appeal that the trial court improperly had relieved the state of its burden of proving an element of the crime of violation of a protective order, to wit, the fact that a valid protective order existed. Id., 191. As does the defendant in the present case, the defendant in *Arluk* sought review of his unpreserved instructional error claim under *Golding*. Id. This court held that the defendant, by his conduct at trial, had implicitly waived his claim and could not satisfy *Golding*'s third prong. Id., 193.

The *Arluk* court stated: "We are mindful that in the usual *Golding* situation, the defendant raises a claim on appeal which, while not preserved at trial, at least was not waived at trial. *State* v. *Cooper*, 38 Conn. App. 661, 667, 664 A.2d 773, cert. denied, 235 Conn. 908, 665 A.2d 903 (1995), cert. denied, 517 U.S. 1214, 116 S. Ct. 1837, 134 L. Ed. 2d 940 (1996). [In *Cooper*], we held that a defendant could not satisfy the third prong of *Golding* where he had implicitly waived at trial a challenge to the alleged constitutional deprivation that was the basis of his claim on appeal. Therefore, a defendant cannot prevail under *Golding* on a claim that he implicitly waived at trial." (Internal quotation marks omitted.) *State* v. *Arluk*, supra, 75 Conn. App. 192.

Our conclusion rests on the manner in which the defense dealt with the issue of the protective order at trial. The record discloses that the defendant stipulated to the fact that the court entered a "full no contact protective order" against him prior to 1 p.m. on April 27, 2001. The defendant also stipulated to the fact that on May 18, 2001, the court modified that protective

order, thereby permitting him to return to the victim's home to retrieve belongings only if he did so while accompanied by a police officer. In accordance with the wishes of the parties, the court marked each of those protective orders as full exhibits at trial. During its charge, the court instructed the jury in accordance with that stipulation, an instruction to which the defendant did not object.[7] Furthermore, the defendant also stipulated to the admission into evidence of a redacted version of the transcript of proceedings before the court on April 27, 2001. The transcript contains the court's explanation to the defendant of the effect of the protective order, specifically, that he was not to return to the residence or have any contact with the victim. Far from objecting to the admissibility of those documents, the defendant stipulated to their existence and effect.

During direct examination by the state, the prosecutor questioned the victim about the protective order that she had obtained; the defendant did not object to the questions. During closing argument to the jury, the prosecutor discussed the protective order, its preclusive effect on the defendant and the fact that the parties had "stipulated" to the fact that the court had issued the order. Again, that reference was met with no objection by the defendant. Moreover, the defendant's counsel explicitly referred to the protective order, as well as its preclusive effect on the defendant, during closing argument to the jury. The defendant's counsel argued that had the defendant actually appeared at the victim's home on the afternoon of April 27, 2001, it would have been logical for the victim to have called the police to report a violation of the protective order. The defen-

---

[7] The court stated: "As you will recall, there was one stipulation of fact. More specifically, that the defendant appeared in court on April 27, 2001, at which time a full no contact protective order was entered against him, and that event occurred prior to 1 o'clock in the afternoon on [April 27]. And that that order remained in effect until May 18, 2001."

dant's counsel argued that the victim did not make such a telephone call because the defendant never appeared at her residence at all that day. Counsel stated that "that incident never happened." Likewise, the defendant failed to object to the court's instruction concerning the offense.

"A defendant in a criminal prosecution may waive one or more of his or her fundamental rights. *State* v. *Cooper*, supra, 38 Conn. App. 669. Although the state must ordinarily prove even the undisputed elements of the crime charged, it is not necessary that a defendant's waiver of that requirement be express. Id., 670. To allow the defendant to seek reversal now that his trial strategy has failed would amount to allowing him to induce potentially harmful error, and then ambush the state with that claim on appeal." (Internal quotation marks omitted.) *State* v. *Arluk*, supra, 75 Conn. App. 193.

The court's instructions were tailored to reflect the actual issues before the jury. With regard to the instruction on the charge of burglary in the third degree, those issues were whether the defendant had entered the victim's residence and whether he did so with the requisite mental state required for the commission of the crime. Whether such an entry was unlawful, given the existence of the no contact protective order, was no longer an issue in the case. For those reasons, we conclude that the defendant has failed to demonstrate that the instruction possibly misled the jury or that the instruction violated his right to due process. The claim fails under *Golding*'s third prong.

B

The court, in its instruction regarding criminal violation of a protective order, stated as follows:

"The second count charges the defendant with criminal violation of a protective order in violation of § 53a-

223 of the Penal Code, which provides as follows: A person is guilty of criminal violation of a protective order when an order issued pursuant to subsection (e) of [General Statutes §] 46b-38c has been issued against such person and such person violates such order. Therefore, for you to find the defendant guilty of this charge, the state must prove the following elements beyond a reasonable doubt. Number one, that a protective order issued pursuant to subsection (e) of § 46b-38c has been issued against the defendant. Two, that the defendant violated the protective order.

"Now, the first element the state must prove is that the protective order was issued against the defendant. In this connection, I charge you that the state's exhibit four is, in fact, a protective order issued under § 46b-38c (e) and that said protective order was, in fact, issued against the defendant on April 26, excuse me, that should be April 27, 2001. Thus, I charge you that the state has proven the first element of this crime beyond a reasonable doubt, and you need not deliberate any further on this first element.

"The second element which the state must prove is that the defendant violated any one of the conditions of this protective order. That is, before you may find the defendant guilty of this count, the state must prove beyond a reasonable doubt, one, that the defendant imposed a restraint upon the person or liberty of [the victim] or, two, the defendant threatened, harassed or assaulted [the victim] or, three, the defendant entered the dwelling of [the victim] or, four, the defendant contacted [the victim]. I will now define the various terms for you.

"The term violated has no special meaning, but is used in this statute in its ordinary meaning. The term restrain means to restrict a person's movements intentionally and unlawfully in such a manner as to interfere

with her person or liberty by moving her from one place to another, or by confining her either in the place where the restriction commences or in a place to which she has been moved without consent.

"To threaten means to express an intention to injure another person. To harass means to trouble, worry or torment. To assault means to inflict immediate injury upon the person of another who is then present. That is, it is an intentional attempt by violence to do injury to the person of another. To enter a dwelling the defendant need not necessarily place his entire body inside the premises. Inserting any part of the body or an implement or weapon held by him within the premises is sufficient to constitute such an entry. Dwelling means a building that is usually occupied by any person lodging therein at night. It need not, however, be actually occupied by any person at the time of the crime. It does not lose its character as a dwelling merely because it's temporarily unoccupied. Finally, the term contacted has no special meaning, but is used in this statute in its ordinary meaning.

"In conclusion, if you find that the state has proven beyond a reasonable doubt each of the elements of the crime of criminal violation of a protective order, then you shall find the defendant guilty. On the other hand, if you find that the state has failed to prove beyond a reasonable doubt any one of the elements, you shall find the defendant not guilty."

The defendant argues on appeal that the court "clearly omitted any reference in its charge on the offense of criminal violation of a protective order that the defendant must have intentionally violated the protective order. The defendant believes that such an element exists and that the defendant's due process rights required that the jury be instructed upon all of the elements of this crime." The defendant asserts that

§ 53a-223 is a specific intent statute requiring that the state prove that the defendant possessed the specific intent to commit the act or acts prohibited by the court order.

This court recently has addressed the issue of whether a trial court's failure to instruct a jury that intent is a necessary element of the crime of criminal violation of a protective order deprives a defendant of due process. *State* v. *Charles*, 78 Conn. App. 125, 128–32, 826 A.2d 1172 (2003). In *Charles*, this court held that § 53a-223, *rather than being a specific intent statute,* was a general intent statute "requiring proof that one charged with its violation intended to perform the activities that constituted a violation of the protective order." Id., 131.

The trial court in the present case did not give an instruction as to general intent, either. As was the case in *Charles*, however, we conclude that such an instruction was not necessary because the defendant did not put in issue the question of whether his conduct was voluntary. See id., 132. The defendant, both at trial and on appeal, has not argued that he lacked the intent to enter the victim's residence on April 27, 2001, or that he appeared at the residence involuntarily or through accident, mistake or absentmindedness. Rather, the defendant consistently has argued only that he did not appear at the victim's residence at all. Under those circumstances, the omission of a general intent instruction does not render the overall instruction as to the crime constitutionally deficient. See id., 132.

For those reasons, we conclude that the court's instruction was proper; the defendant's claim fails under *Golding*'s third prong.

C

Finally, the defendant challenges the court's instruction as to the jury's option of drawing inferences from

the facts it found proven. After instructing the jury as to the differences between direct and circumstantial evidence, and that the jury would not be justified in finding the defendant guilty unless the facts and circumstances led them "to only one conclusion," the court stated as follows:

"Now, a word about inferences. You are entitled to draw inferences from the established facts in the case. The inferences which you draw, however, must not be from a guess or speculation upon the evidence, or a surmise about the evidence, but they must be from a fact which the evidence has established and, of course, the evidence includes all of the exhibits as well as the testimony and the stipulation in this case. Inferences that you may draw from these established facts must be logical, reasonable and well founded upon facts which have been proven in the trial of the case. A jury may draw all reasonable inferences from the testimony. The test is not that the inference must unavoidably and unerringly point in one direction, but rather whether the rational mind could, with reasonableness, draw that inference.

"In this case, therefore, it will be part of your duty to draw all reasonable inferences as to what the purpose, intention or knowledge was in the defendant's mind based upon the conduct of the defendant and considered in the light of the surrounding circumstances."

The defendant posits that the foregoing instruction diluted the state's burden of proof, thereby depriving him of his constitutional right to due process. The defendant argues that the court misled the jury into believing that it could find the defendant's specific intent, where such an intent was a necessary element of the crimes of which he stood charged, by drawing reasonable and logical inferences from the evidence, rather than by

making findings on the basis of proof beyond a reasonable doubt.

The defendant correctly refers to an overriding principle that governs our review of claims of instructional error and which has particular relevance here: We do not review individual instructions in artificial isolation from the rest of the court's charge. Instead, we view the charge as a whole to determine if the instructions are "correct in law, adapted to the issues and sufficient for the guidance of the jury . . . ." (Internal quotation marks omitted.) *State* v. *Davis*, 76 Conn. App. 653, 677, 820 A.2d 1122 (2003).

We observe that several times throughout the charge, the court discussed generally the state's burden of proof. Just prior to discussing the topic of inferences, the court instructed the jury that "[i]n passing upon the guilt of an accused person on the basis of circumstantial evidence, you must be satisfied first that certain facts or circumstances exist. And, second, that those facts or circumstances lead you to conclude beyond a reasonable doubt that the crime was committed by the accused." The court later instructed the jury that "[i]n this case, as in all criminal prosecutions, the defendant is presumed to be innocent until proven guilty beyond a reasonable doubt. . . . As far as you are concerned, the defendant is presumed to be innocent, and this presumption of innocence continues unless and until such time as all the evidence produced here in the orderly conduct of the case considered in the light of these instructions of law and deliberated upon by you in the jury room satisfies you beyond a reasonable doubt that he is guilty."

The court stated further: "[T]he state must prove beyond a reasonable doubt each and every element necessary to constitute the crime charged . . . . The state must prove every element necessary to constitute

the crime charged. It is not enough for the state to prove only certain of those elements because if proof of even one element is lacking, you must find the defendant not guilty. The state, in other words, can sustain the burden resting upon it only if the evidence before you establishes the existence of every element constituting the crime charged beyond a reasonable doubt." The court explained to the jury the concept of reasonable doubt and reiterated several times, in the context of the different charges against the defendant, which required the state to prove that he possessed a specific criminal intent and that the state bore the burden of proving every element of the crimes charged beyond a reasonable doubt.[8]

Having reviewed the entire charge, we conclude that it did not possibly mislead the jury. First, the court's instructions unambiguously and repeatedly informed the jury that in regard to making findings of fact, either on the basis of direct or circumstantial evidence, such findings must be proven beyond a reasonable doubt. Second, the court properly instructed the jury that with

---

[8] In its charge on disorderly conduct, the court instructed the jury in relevant part: "[F]or you to find the defendant guilty of this charge, the state must prove the following elements beyond a reasonable doubt. Number one, that the defendant acted with the intent to cause inconvenience, annoyance or alarm."

In its charge on assault in the third degree, the court instructed the jury in relevant part: "For you to find the defendant guilty of this charge, the state must prove the following elements beyond a reasonable doubt. Number one, that the defendant intended to cause physical injury to another person."

In its charge on burglary in the third degree, the court instructed the jury in relevant part: "For you to find the defendant guilty of this charge, the state must prove the following elements beyond a reasonable doubt. . . . Three, that the unlawful entry was effected or occurred with the defendant's intent to commit the crime of assault in the third degree in that building."

In its charge on breach of the peace, the court instructed the jury in relevant part: "[F]or you to find the defendant guilty of this charge, the state must prove the following elements beyond a reasonable doubt. Number one, that the defendant acted with the intent to cause inconvenience, annoyance or alarm."

regard to drawing inferences on the basis of facts it had found established beyond a reasonable doubt, it was entitled to draw any reasonable and logical inferences on the basis of those facts. The court correctly stated the applicable legal principles, and there was no danger that its instruction possibly misled the jury.

Where, as here, there existed factual issues related to the defendant's intent, we recognize that such factual issues are "characteristically proven by circumstantial evidence . . . ." (Internal quotation marks omitted.) *State* v. *Zaporta*, 36 Conn. App. 250, 265 n.11, 650 A.2d 582 (1994), aff'd, 237 Conn. 58, 676 A.2d 814 (1996). It is obvious that "direct evidence of the accused's state of mind is rarely available" and, therefore, "intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom." (Citations omitted; internal quotation marks omitted.) *State* v. *Sivri*, 231 Conn. 115, 126, 646 A.2d 169 (1994).

The defendant does not challenge the court's instructions with regard to making findings on the basis of circumstantial evidence. The court properly instructed the jury that, as with findings made on the basis of direct evidence, such findings must be proven beyond a reasonable doubt. That being the case, the court's instructions that the jury was free to draw inferences that were "logical, reasonable and well founded upon facts which have been proven" was entirely proper.

Similar challenges to jury instructions have been met unfavorably. Our Supreme Court has explained: "In the course of a charge on drawing inferences from circumstantial evidence, a court may correctly instruct a jury that it has the prerogative to draw inferences that are reasonable and logical. Such an instruction, at least when qualified . . . by a caveat that both the ultimate inference of guilt and the facts essential to that infer-

ence must be proved beyond a reasonable doubt, does not dilute the constitutional standard of proof in a criminal case." (Internal quotation marks omitted.) *State* v. *Silano*, 204 Conn. 769, 773–74, 529 A.2d 1283 (1987); see also *State* v. *Price*, 205 Conn. 616, 622, 534 A.2d 1196 (1987).

The defendant posits, without citing any authority, that "any inference used to prove [his] ultimate guilt or a necessary element of a crime must be proved beyond a reasonable doubt." The law regarding inferences, however, is clear. "Due process does not . . . require that each subordinate conclusion established by or inferred from evidence, or even from other inferences, be proved beyond a reasonable doubt. We have regularly held that a jury's factual inferences that support a guilty verdict need only be reasonable. . . . Equally well established is our holding that a jury may draw factual inferences on the basis of already inferred facts." (Citation omitted.) *State* v. *Crafts*, 226 Conn. 237, 244, 627 A.2d 877 (1993).

"It is axiomatic that the state's burden of proof beyond a reasonable doubt applies to each and every element comprising the offense charged. But this burden of proof does not operate upon each of the many subsidiary, evidentiary, incidental or subordinate facts . . . upon which the prosecution may collectively rely to establish a particular element of the crime beyond a reasonable doubt. . . . Where the prosecution must rely upon circumstantial evidence, either in part or in whole, each link in the chain of circumstantial evidence need not be established beyond a reasonable doubt . . . ." (Internal quotation marks omitted.) *State* v. *Williams*, 220 Conn. 385, 398, 599 A.2d 1053 (1991).

Consistent with that burden of proof, this court, in reviewing a claim of insufficient evidence, asks "whether the [trier] could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of

the evidence was sufficient to justify the verdict of guilty beyond a reasonable doubt . . . ." (Internal quotation marks omitted.) *State* v. *Hooks*, 30 Conn. App. 232, 239, 619 A.2d 1151, cert. denied, 225 Conn. 915, 623 A.2d 1025 (1993).

Stated somewhat differently, "[t]he trier may not reach a conclusion of guilt where the facts, established by the evidence, including those reasonably and logically inferred from other proven facts, are rationally consistent with the innocence of an accused. A conclusion of guilt requires proof beyond a reasonable doubt, and proof to that extent is proof which precludes every reasonable hypothesis except that which it tends to support, and is consistent with the defendant's guilt and inconsistent with any other rational conclusion. . . . Moreover, inferences which do not have a basis in facts established by the evidence cannot be drawn or relied upon to sustain a verdict. . . . The jury may not resort to speculation and conjecture. . . . If the evidence is insufficient to sustain the burden of proof beyond a reasonable doubt, the verdict must be set aside." (Citations omitted; internal quotation marks omitted.) *State* v. *Sivri*, supra, 231 Conn. 131–32.

The court properly instructed the jury that it was "entitled to" draw logical and reasonable inferences from the facts it had found proven. Viewed in conjunction with the court's proper instructions as to making findings of fact, the defendant's presumption of innocence and the state's burden of proving each and every element beyond a reasonable doubt, we conclude that the court's instructions properly reflected the applicable legal principles required to guide the jury to a proper verdict.

For those reasons, the defendant has failed to demonstrate that the court's charge was in any way improper. Accordingly, his claim fails under *Golding*'s third prong.

The judgment is affirmed.

In this opinion the other judges concurred.

